Amanda HEBEIN, a minor, by her next friend Pilar BERMAN, Pilar Berman and Norman Berman, Plaintiffs,

v.

Jackie YOUNG, an employee of the Illinois Department of Children and Family Services, in his individual capacity, et al., Defendants.

No. 98 C 1850.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 25, 1998.

Robert E. Lehrer, Diane L. Redlead, Leher & Redleaf, Chicago, IL, for Plaintiff.

Cynthia J. Wood, Charles A. Rego, Ill. Attorney General's Office, Chicago, IL, Ronald Kawanna, Jr., Edward A. Antonietti, Calumet, City, IL, Ronald N. Primack, Lansing, IL, Jon Yambert, Sharon M. Pearl, Chilton, Yambert & Porter, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

HART, District Judge.

This case involves a dispute regarding custody of a four-year-old girl. Possible physical abuse was reported by a day care worker which resulted in the girl being placed in the custody of her grandparents for approximately eight months. Plaintiffs complain that employees of the state's child welfare agency and a local police department, as well as the grandparents, acted wrongfully in separating the girl from her mother and stepfather.

Plaintiffs in this case are Amanda Hebein,[1] her mother Pilar Berman, and Norman Berman. Norman is the husband of Pilar and stepfather of Amanda. During the times relevant to this case, Norman apparently had no legal right to custody of Amanda; the parental rights in question are Pilar's right to custody or a relationship with Amanda. Named as defendants are four employees of the Illinois Department of Children and Family Services ("DCFS") and four employees of the Calumet City Police Department ("CCPD"). Also named as defendants are Reno Boe and Anita Boe, Pilar's parents.[2] The DCFS defendants are Jackie Young, an investigator in the Division of Child Protection ("DCP"); Sandy Threatt, a DCP lead investigator who was Young's immediate supervisor; Veronica Edmonds, a DCP employee; and Roy Hall, a caseworker responsible for "follow-up" work after the initial investigation by DCP employees. The CCPD defendants are Walter Bergstrom, Timothy Murphy, Ronald Hanrahan, and Paul Ritchie. The state defendants are sued in their individual capacities only. Presently pending are motions to dismiss all the claims against the state defendants, which would be all the federal claims.[3]

The complaint contains eight counts. Count I is labeled as a "42 U.S.C. § 1983 claim for violation of Fourth Amendment right not to be subject to unreasonable seizures." Count I is brought by Amanda against DCFS defendants Young, Edmonds, and Threatt, and all four CCPD defendants. Amanda claims that taking her from her parents' home was without any rational or reasonable basis. Count II is labeled as a "42 U.S.C. § 1983 claim for violation of substantive due process rights of minor not to be placed in a dangerous environment by state officials, and to be protected from harm when state officials have taken her into custody against her will and restrained her liberty." Count II is brought by Amanda against the four DCFS defendants. Amanda claims defendants knew or suspected that being placed with the Boes would be dangerous to her. Count III is labeled as a "42 U.S.C. § 1983

---

1. The claims on behalf of Amanda are brought by her next friend Pilar Berman. For simplicity in presentation, Amanda will be referred to as one of the plaintiffs.

2. The DCFS and CCPD defendants, that is the defendants other than the Boes, will be referred to collectively as the state defendants. The Bermans and Boes, as well as Amanda, will each be referred to by their first names.

3. The Boes are also named as defendants to two of the federal claims, as private actors acting in concert with state actors. To the extent the claims against the state defendants fail to state a claim, the claims against the Boes would also be dismissed.

claim for violation of substantive due process rights to family association, family autonomy, family integrity, and family privacy." Count III is brought by Amanda and Pilar against all ten defendants. Plaintiffs claim defendants lacked a rational or reasonable basis for depriving plaintiffs of their rights. Count IV is labeled as a "42 U.S.C. § 1983 claim for violation of procedural due process rights." Count IV is brought by Amanda and Pilar against the four DCFS defendants and the Boes. Plaintiffs complain about defendants taking over two months to initiate a judicial hearing, making false representations to secure a hearing, and obtaining a court order on a constitutionally infirm record. The remaining counts are supplemental state law claims against the Boes.[4]

On a Fed.R.Civ.P. 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations of fact are taken as true and all reasonable inferences are drawn in the plaintiff's favor. *Leatherman v. Tarrant County Narcotics Unit*, 507 U.S. 163, 164–65, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Swofford v. Mandrell*, 969 F.2d 547, 549 (7th Cir.1992). A complaint need not set forth all relevant facts or recite the law; all that is required is a short and plain statement showing that the party is entitled to relief. Fed.R.Civ.P. 8(a); *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir.1996). A plaintiff in a suit in federal court need not plead facts; conclusions may be pleaded as long as the defendant has at least minimal notice of the claim. Fed.R.Civ.P. 8(a)(2); *Jackson v. Marion County*, 66 F.3d 151, 153–54 (7th Cir.1995); *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir.1997). It is unnecessary to specifically identify the legal basis for a claim. *Albiero*, 122 F.3d at 419; *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir.1992). It is also true, however, that a party can plead him or herself

out of court by alleging facts showing he or she has no viable claim. *Jackson*, 66 F.3d at 153–54; *Tregenza v. Great American Communications Co.*, 12 F.3d 717, 718 (7th Cir.1993), *cert. denied*, 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994); *Early v. Bankers Life & Casualty Co.*, 959 F.2d 75, 79 (7th Cir.1992). Further, as long as they are consistent with the allegations of the complaint, a plaintiff may assert additional facts in his or her response to a motion to dismiss. *Albiero*, 122 F.3d at 419; *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1428 (7th Cir.1996); *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439–40 (7th Cir.1994); *Hrubec v. National Railroad Passenger Corp.*, 981 F.2d 962, 963–64 (7th Cir.1992). Although the complaint itself need not specifically or correctly identify the legal basis for any claim, in response to a motion to dismiss that raises issues as to a claim, the plaintiff must identify the legal basis for the claim and make adequate legal arguments in support of it. *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir.1995); *Levin v. Childers*, 101 F.3d 44, 46 (6th Cir.1996); *Carpenter v. City of Northlake*, 948 F.Supp. 759, 765 (N.D.Ill.1996). *See also Teumer v. General Motors Corp.*, 34 F.3d 542, 545 (7th Cir.1994).

While a motion to dismiss is generally decided on the pleadings alone, judicial notice may be taken of proceedings in other courts if the proceedings are directly related to the case. *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir.), *cert. denied*, 516 U.S. 1028, 116 S.Ct. 673, 133 L.Ed.2d 522 (1995); *Green v. Warden*, 699 F.2d 364, 369 (7th Cir.), *cert. denied*, 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983). Documents that are referred to in the complaint and are central to the plaintiff's claim may also be considered even if

---

**4.** The Boes are expressly alleged to be Illinois residents and all indications are that the plaintiffs were Illinois residents at the time the complaint was filed in that the Bermans are alleged to still be working in Illinois and all events alleged in the complaint occurred

in Illinois. Since diversity of citizenship is lacking, the only basis for jurisdiction over the state law claims is supplemental jurisdiction and that is the provision cited in the complaint. *See* 28 U.S.C. § 1367.

not attached to the complaint. *Duferco Steel Inc. v. M/V Kalisti*, 121 F.3d 321, 324 n. 3 (7th Cir.1997); *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir.1993). The DCFS defendants provide court orders and pleadings from state court custody proceedings and a related criminal case against Norman. Although other objections are raised, plaintiffs do not question the authenticity of the court documents provided. Judicial notice of these documents may be taken without converting the DCFS defendants' motion into one for summary judgment. The state court documents, however, will be considered only for the purpose of determining what pertinent court proceedings or orders may have taken place. The factual assertions contained in some of the state court pleadings will not be assumed to be true-at most, such assertions show what accusations were made before the state court. The police report attached to the CCPD defendants' reply brief is not a document that may be considered in ruling on the motion to dismiss and it will not be considered.

Taking into account the above stated rules, the facts assumed to be true for purposes of ruling on the motions to dismiss are as follows. Amanda was born on December 23, 1992. She suffers from cerebral palsy and requires special care, including the use of leg braces. Her speech development has also been delayed. Pilar is Amanda's mother. After Pilar separated from Amanda's father, Pilar and Amanda moved into a house owned by Reno. The Boes cared for Amanda during the day while Pilar worked. After her divorce, Pilar began dating Norman and they were married in May 1996, with Norman moving into the Reno-owned house. Prior to May 1996, Norman apparently maintained a separate apartment, but was involved in Amanda's care.

In February 1996, it was determined that Amanda would need glasses and leg braces. This upset Reno who became incensed with Norman and thereafter expressed hatred toward him. Pilar and Norman became concerned that the Boes were not adequately caring for Amanda during the daytime. Effective April 1, 1996, Pilar enrolled Amanda in the Tiny Town Day Care Center in Lansing, Illinois. This decision upset the Boes who began a concerted effort to take custody of Amanda away from Pilar. As part of this effort, they began making false reports of abuse to DCFS. On March 26, 1996, Reno falsely reported that Pilar and Norman were not adequately feeding Amanda and that they were leaving her in the care of an unqualified 11–year–old. In May 1996, DCFS concluded this report was unfounded. In the meantime, Reno continued to make false reports of abuse or neglect.

Because of her cerebral palsy, Amanda frequently fell, resulting in bruises, scrapes, and other injuries. She also suffered convulsive seizures during which she was sometimes injured. Some of these injuries occurred at Tiny Town and the staff at Tiny Town was aware of the source of Amanda's bruises. Nevertheless, on July 25, 1996, Tiny Town employees reported the possibility of abuse to DCFS. On August 1, DCFS determined this report was unfounded.

On October 11, 1996 at 7:00 a.m., Pilar dropped Amanda off at Tiny Town. At 3:30 p.m., Pilar called Tiny Town to inform the staff that Anita would pick up Amanda at the end of the day. The Boes picked Amanda up shortly after 4:15 p.m. and were to take Amanda to the Bermans' home. Shortly before that, however, a Tiny Town employee called DCFS to report that Amanda was bruised and that Amanda had said, "Daddy did this to me."[5] A few hours later, the CCPD de-

---

**5.** Defendants read the complaint as also alleging that the day care worker reported that the bruise looked like a belt buckle. Paragraph 36 of the complaint states in part: "The caseworker also later stated that, to her, the bruise itself looked 'like a belt buckle.'" "Caseworker" apparently is a typographical

error for day care worker, since it is alleged that no DCFS employee saw Amanda until 19 days later, that employee was male, and he reported seeing a reddish bruise with there being no reference to it looking like a belt buckle. But even assuming "caseworker"

fendants took Amanda into their protective custody and then placed her with the Boes. Edmonds of DCFS informed Bergstrom of the CCPD that this seizure and placement was authorized by DCFS.

When the Bermans returned home that evening, they called the Boes to find out where Amanda was. The Boes informed them that Amanda had been placed with them and that the Bermans should talk to the CCPD if they wanted more information. Eventually, the Bermans went to the CCPD station where one or more of the CCPD defendants interrogated Norman and accused him of child abuse, including breaking Amanda's teeth. The officers then arrested Norman and charged him with felony child abuse.

Although the CCPD defendants told the Bermans that Amanda had suffered a horrendous injury, they had no basis for such a belief and no sufficient basis for believing either of the Bermans represented a danger to Amanda. Despite their representations to the Bermans that Amanda had suffered a horrendous injury, the CCPD defendants did not take Amanda for any medical evaluation or care.

On October 12, a bond hearing was held in Norman's criminal case. Defendants Bergstrom and Murphy were present in court that day. Norman was granted bond, but the court directed that Norman have no contact with Amanda.[6] The court did not enter any order specifically pertaining to Pilar's relationship with Amanda. However, for Norman to be in compliance with his bond, Norman could not be present in the Berman home at the same time as Amanda. Early in the morning of October 13, Norman was released on bond.

Later on the 13th, Pilar attempted to pick up Amanda from the Boes, but they declined on the ground that they would get into trouble with DCFS if they allowed Pilar to take Amanda. The Boes instead urged Pilar to surrender to them the legal custody of Amanda.

On October 12, DCFS sent Norman notice of a new investigation of the latest abuse charges. Young was assigned to investigate the charges. Between October 12 and October 30, the Boes were the only parties to this case who saw Amanda. They also dropped Amanda's enrollment in Tiny Town.

Although the applicable rules call for an in-person observation of a child abuse victim within 24 hours after a report of abuse, *see* 89 Ill. Admin. Code § 300.90(a), Young did not see Amanda until October 30. The regulations, however, also provide that investigation of a child abuse report may be delegated to police officers if there is a concurrent criminal investigation. *See id.* § 300.80(a). As to his first meeting with Amanda, Young reported observing "reddish" bruises in the spot where the Tiny Town worker had reported bruises. Young did not seek any medical evaluation for these bruises. On October 31, when Pilar finally was able to see Amanda, Amanda had no bruises at all. It must be inferred that there were also no bruises when Young met with Amanda the previous day.

Illinois law provides that a minor in protective custody be brought before a

means the day care worker, it cannot be assumed that this information was reported prior to the acts of taking custody away from Pilar. The complaint does not clarify "later," so any reasonable inference as to "later" must be drawn in plaintiffs' favor.

**6.** Paragraph 17 of the October 12, 1996 court order (Exh. la to DCFS defendants' motion to dismiss) states: "Respondent [Norman] is further ordered and/or enjoined as follows: No unlawful contact w/protected party." The state court file jacket (Exh. 1b to DCFS defen-

dants' motion to dismiss) notates the order entered as: "CWNIC Gerstein finding. Bond set @ $100,000. condition of bond no contact w/children." The state court "half-sheet" (*id.*) contains a similar notation. Defendants argue the order was no contact at all, while plaintiffs contend in their brief that the court documents are unclear as to whether it is "no contact" or "no unlawful contact." Plaintiffs, however, allege in ¶ 46 of their complaint that it is "no contact," and that is what will be assumed to be true.

judicial officer within 48 hours (excluding weekends and holidays) for a temporary custody hearing. 705 ILCS 405/2–9(1). During the days and weeks immediately following the October 11 incident, none of the state defendants took any action to initiate such a proceeding.

Prior to and immediately following Amanda's placement with the Boes, none of the state defendants made any attempt to determine whether the Boes were adequate and safe caregivers. Had they done so, they would have found that Reno had a history of violence, including arrests for domestic violence. Any reasonable investigation would have disclosed that Reno was a dangerous and unfit caregiver. Moreover, within days, Pilar began reporting Reno's past history to Young. This information was passed on to Threatt as well. Young and Threatt were provided with information that could only lead to the conclusion that Reno was unfit for the placement. Also, well before Amanda was returned to the Bermans, Hall had knowledge that Reno was an unfit caretaker. Young and Threatt were also aware from the beginning that the placement with the Boes was not voluntary on Pilar's part.

Young delayed his investigation for several weeks and then conducted it in an incompetent manner. He did not obtain any medical evaluation and failed to interview Amanda outside the presence of Reno. Young also failed to investigate Reno's false report to him that Reno had a court order authorizing Amanda's placement with the Boes. Young also may not have interviewed the day care worker who initiated the report. Young accepted Reno's accusations that Norman had abused Amanda without having any corroboration. On November 14, 1996, Young recommended a finding of indicated as to the abuse report. There is no allegation as to when a final decision was made as to this finding. In a December 13, 1996 letter, Young informed Pilar and Norman of the finding. Prior to sending that letter, Young told Reno of the finding.

On December 6, 1996, the Boes filed an emergency petition for custody in the Circuit Court of Cook County, Illinois. The Boes' petition contained false accusations of abuse by the Bermans, including repeating accusations that DCFS had determined were unfounded and falsely claiming the Bermans were drug users. Plaintiffs allege that the petition was denied on its face for lack of standing. Defendants, however, provide a copy of the emergency petition and a court order [7] from that same case which is stamped as having been entered on December 6. The order provides:

It Is Hereby Ordered,

1. That a temporary restraining order shall issue instanter, restraining and enjoining Pilar Berman and/or her agents from removing the minor child Amanda from the care & possession of the maternal Grandparents Reno and Anita Boe.

2. That Reno and Anita Boe are granted temporary possession of the minor child Amanda Hebein.

3. That the hearing on this petition and temporary restraining order is set for December 17, 1996 at 9:30 am.

Plaintiffs do not dispute that this order was entered, but contend defendants are "providing a single order out of context." *See* plaintiffs' statement pursuant to General Rule 12N ¶ 10. No party provides any additional orders to place the December 6 Order in context, nor does any party attempt to clarify any proceedings in that case. Still, the factual allegations of the complaint must be construed in plaintiffs' favor. Therefore, it will be assumed that the December 6 Order only remained in effect until the December 17 hearing, whereupon the court denied the petition on its face for lack of standing.

Where the parent or custodian does not object, DCFS may place a minor with a willing relative without going through court procedures. *See* 89 Ill. Admin. Code § 300.150(a). The DCFS defendants treated Amanda's placement as one with a

---

7. The order is the last page of Exh. 2 to DCFS defendants' motion to dismiss.

willing relative. However, Edmonds, Young, and Threatt knew all along that the placement with the Boes was not a voluntary placement and that Pilar objected to it. On or shortly before December 19, 1996, Young took the first step in seeking a court determination of Amanda's custody. He requested that the Cook County State's Attorney initiate a wardship proceeding. This request contained information that Young knew to be false, including that prior allegations of abuse had been indicated even though they had been unfounded.

On December 19, the State's Attorney filed a petition for adjudication of wardship and the initial court hearing was on December 23. During the December 23 hearing, Young knowingly provided false testimony as to two incidents of Norman beating Pilar. Following the hearing and based at least in part on Young's false testimony, the Circuit Court granted temporary custody to the DCFS Guardianship Administrator, with DCFS having the right to place the child. _See_ Exh. 3a to DCFS defendants' reply brief. Young and Threatt made the decision to continue to place Amanda with the Boes. The December 23 order of protection[8] recognizes that, as of the court date, the placement was with the Boes and places conditions on that custody. The placement with the Boes is specifically referred to as "physical but not legal custody." Two conditions of the placement with the Boes were to provide certain medical care and not to use excessive corporal punishment. The order of protection also provided that Pilar was to be allowed unlimited supervised day visitations at DCFS's discretion.

On January 14, 1997, Young and Threatt made the decision to register the indicated finding in Illinois's Central Register. This report found that Norman had caused "cuts, bruises, and welts" and the finding against Pilar was for "substantial risk of physical injury." Also, on January 14, responsibility for Amanda's case was transferred to Hall, a "follow-up" worker. Hall

continued the placement with the Boes without making any initial investigation of whether it was a safe and appropriate placement. Hall opposed Pilar's continued attempts to regain custody as well as her attempts to have unsupervised visits. Such opposition continued even after April 24, 1997, by which time Hall had knowledge of the danger Reno posed for Amanda. Over the remaining months of their custody, the Boes only permitted Pilar to visit Amanda on a few occasions.

In March 1997, Reno falsely reported that Norman had sexually abused Amanda. As a result of this report, Hall arranged a full professional assessment of all parties through a hospital program. As a result of an April 24, 1997 psychiatric report indicating that Reno might have a psychiatric impairment, the juvenile court entered an order of protection precluding Reno from having contact with Amanda. Nevertheless, Hall continued to oppose returning Amanda to the Bermans' home.

A trial on the wardship petition was set for June 17, 1997. Between April and the scheduled trial date, three professional assessments of Amanda and her caretakers were completed and provided to the parties involved. A forensic counselor found that the Boes were psychologically disturbed and that the Bermans were stable and reliable caretakers of Amanda. A report by Mt. Sinai Hospital's Under the Rainbow program found that Reno exhibited paranoid and tangential thought disorders, that he provided inaccurate and false reports, and that he was waging the custody battle at the expense of Amanda's emotional well-being. A team of child development specialists from LaRabida Hospital reported that Reno had to be stopped from discussing abuse allegations in Amanda's presence. They found that Amanda's comprehension and linguistic abilities were substantially delayed and that the delay may have resulted from "probable emotional disturbance." Based on these assessments, the parties agreed Amanda

---

**8.** The order of protection is Exh. 3 to DCFS defendants' motion to dismiss.

should be returned to Pilar's custody and the court concurred without adjudicating the abuse claims brought by the state.

During the time she was placed with the Boes, the Boes generally kept her in their house and prevented her from seeing her mother. The Boes also failed to properly care for Amanda. She developed extensive tooth decay, became obese, and her mobility skills worsened. Her linguistic, emotional, and social skills were further delayed and she suffered emotional disturbance. Amanda may have been physically and sexually abused by Reno. After her return to the Bermans, Amanda has expressed no desire to see or speak to her grandparents and has had nightmares about them.

On November 19, 1997, the juvenile court closed the wardship case upon uncontested reports that Amanda had been receiving excellent care with the Bermans. On January 19, 1998, the criminal court dismissed the criminal charges against Norman. On February 4, 1998, DCFS changed the indicated report to unfounded.

■ Defendants rely in part on qualified immunity. A state actor performing a discretionary function is entitled to qualified immunity from § 1983 liability if either the federal law asserted to have been breached was not clearly established at the time of the alleged violation or the actor's conduct was objectively reasonable in light of the established law. *Hammond v. Kunard*, 148 F.3d 692, 696 (7th Cir.1998); *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir.1998). The test is two-part. First, it is considered whether the law was clearly established at the time of the alleged violation, asking "whether the law was clear in relation to the specific facts confronting the public official when he or she acted." *Kelley v. Myler*, 149 F.3d 641, 648 (7th Cir.1998) (quoting *Biddle v. Martin*, 992

F.2d 673, 675 (7th Cir.1993)). The burden is on plaintiffs to point to the case law showing that the right has been clearly established.[9] *Gossmeyer v. McDonald*, 128 F.3d 481, 495–96 (7th Cir.1997). Second, the objective reasonableness of the defendant's conduct is analyzed, asking "whether reasonably competent officials would agree on the application of the clearly established right to a given set of facts." *Id.* The standard is objective, but does take into account the subjective view of the defendant when the objective standard is applied to the facts known by the particular defendant. *Hammond*, 148 F.3d at 697. Since the motion presently before the court is a Rule 12(b)(6) motion to dismiss, the complaint's allegations as to each defendant's knowledge of pertinent facts must be taken as true. *Id.* at 696–97. Defendants' principal argument is that their conduct was objectively reasonably, with little attempt being made to place that argument in the context of the applicable clearly established law.

Although the parties discuss state law, the questions to be resolved are whether the alleged conduct of defendants violated constitutional requirements. The two central questions are whether, under constitutional standards, (1) defendants had an adequate basis for separating Amanda from Pilar and placing Amanda with the Boes and (2) provided adequate procedures for making such determinations. To the extent constitutional violations are adequately alleged, it must also be determined which, if any, of the defendants may be held responsible for such violations.

■ It is well established that a child and her parent have a constitutionally protected interest in maintaining that family relationship. *Lehr v. Robertson*, 463 U.S. 248, 258, 103 S.Ct. 2985, 77 L.Ed.2d 614

---

9. Defendants, however, are still required to present an adequate argument. Here, defendants make a general assertion that they are entitled to qualified immunity and, even in their replies, generally do not point to any specific aspects of the claims against them that are not clearly established. Plaintiffs cannot be expected to anticipate and respond to every possible manner in which the cases they cite as clearly establishing the law might be distinguished from their specific claims. A more focused argument after discovery may establish defendants' defense.

(1983). Where state actors interfere in that relationship based on alleged abuse, they must have at least a reasonable suspicion that abuse occurred which would justify the degree of interference imposed. *See Croft v. Westmoreland County Children & Youth Services,* 103 F.3d 1123, 1126 (3d Cir.1997) (collecting earlier cases). Defendants contend the initial seizure and placement with the Boes was justified because there was an adequate basis for concluding that Amanda was abused by Norman and therefore remaining in the Berman home would be a threat to her health or safety. Such a conclusion, however, relies on either a misreading of the complaint or facts beyond those that can be considered on a Rule 12(b)(6) motion.

Based on the facts alleged in the complaint, the only information that defendants had when they decided to take custody of Amanda was the day care worker's report that she observed a bruise, the same person's report that Amanda told her Daddy did it, and the CCPD defendants' personal observation of Amanda. The complaint alleges, however, that Amanda had no injuries that would have indicated she was in danger. It is specifically alleged that the CCPD defendants lacked sufficient information to conclude that either of the Bermans represented a danger to Amanda. Plaintiffs do not provide detailed allegations of Amanda's speech development as of October 11, 1996,[10] but on the facts alleged, it can also be inferred that personally observing Amanda would have disclosed that she was not capable of clearly responding to a question of who caused her bruise. On the facts alleged, which must be assumed to be true, it can only be concluded that, as of October 11, no defendant had sufficient support for a reasonable suspicion that Amanda had been abused by Norman.

Since there was no reasonable suspicion of abuse or danger, the clearly established law supports that Amanda's constitutional rights were violated when she was taken into custody. Further, any reasonably competent police officer or social service investigator would have to agree that the facts assumed to be true were insufficient to support a reasonable suspicion. Qualified immunity does not apply.

■ It still must be considered whether the foregoing discussion applies to all the defendants named in Count I.[11] It does apply to all the CCPD defendants because all are alleged to have had the same knowledge and all are alleged to have been involved in the seizure of Amanda. The DCFS defendants contend they are not responsible for the seizure because they delegated their responsibility for the initial investigation to the CCPD defendants. However, it is specifically alleged that Edmonds talked to one of the CCPD defendants and authorized Amanda's seizure on DCFS's behalf. It must be assumed that Edmonds could not have had any more basis for a reasonable suspicion than the CCPD defendants. Therefore a claim is stated against Edmonds.

■ Edmonds also contends that she is entitled to absolute immunity on the ground that she was enforcing the court order in Norman's criminal case. Even ignoring that Edmonds's approval of the removal occurred before any court order was entered, her contention is otherwise inconsistent with the facts. The court order prohibited Norman from having contact with Amanda, it did not order Amanda's removal from Pilar's home. Edmonds argues the practical effect was that Amanda had to leave the home so that Norman would not be in violation of bond. But that was a decision for Norman and Pilar. The criminal court order was not directed to the relationship between Amanda and Pilar and in no way deprived Pilar of any parental right. It was for Pilar (presum-

---

**10.** It is alleged that, at a later point after receiving poor care from the Boes, she was not even capable of answering "yes or no" questions.

**11.** All the state defendants except Hall are named in Count I.

ably in consultation with Norman) to decide whether to (1) have Norman stay away from their home except when Amanda was not there, (2) have Pilar move elsewhere with Amanda, or (3) make an arrangement for Amanda to live elsewhere, which did not have to be with the Boes. The criminal court order did not direct which choice to make and in no way authorized or directed any DCFS employee to make the decision. Edmonds's conduct was not the enforcement of a court order that is entitled to immunity. The Count I claim against Edmonds will not be dismissed.

Young (and therefore his supervisor Threatt) was not assigned to the case until October 12, after Amanda had already been removed from the Berman household. Complaint ¶ 48. Therefore, they cannot be responsible for the seizure of Amanda on October 11. The Count I claims against Young and Threatt will be dismissed.

■ Count II is Amanda's claim against the four DCFS defendants that they placed her in a dangerous environment. Both sides agree that *K.H. v. Morgan*, 914 F.2d 846, 852 (7th Cir.1990), establishes that a child in state custody has the substantive due process right to not be placed with a custodian that the state actor knows or suspects is likely to abuse or neglect the child. *See also Camp v. Gregory*, 67 F.3d 1286 (7th Cir.1995), *cert. denied*, 517 U.S. 1244, 116 S.Ct. 2498, 135 L.Ed.2d 190 (1996); *Taahira W. v. Travis*, 908 F.Supp. 533 (N.D.Ill.1995). *Camp*, 67 F.3d at 1294–97, holds that this duty is not limited to placement in an institution or with a licensed foster parent, but also applies to a placement with a relative.[12] De-

fendants contend that they cannot be liable because, at the time Amanda was first placed with the Boes, they lacked knowledge or suspicion that the Boes represented a likely threat to Amanda.

■ As to Edmonds, defendants' argument has merit. The only alleged involvement of Edmonds is her October 11 approval of the placement of Amanda with her grandparents. There is no allegation that Edmonds's involvement went beyond that initial determination. Instead, it is alleged that Young was assigned to the case on the next day. There is no allegation supporting that, as of October 11, Edmonds had any reason to suspect that the Boes represented any threat. The Count II claim against Edmonds will be dismissed.

■ Young was assigned to the case on October 12. Initially, he had no knowledge of the danger represented by placement with the Boes. Plaintiffs allege any cursory investigation would have revealed the danger and that Young failed to conduct any investigation whatsoever. At this time, it need not be considered to what extent a caseworker's duty to investigate has been clearly established. *See, e.g., Camp*, 67 F.3d at 1297. The complaint is not limited to a claim of failure to investigate, but also alleges that Pilar informed Young of the dangers and that Young became aware of information showing that Reno represented a danger to Amanda. Despite this knowledge, Young continued the placement with Reno. At the point that Young obtained knowledge of the danger, he violated Amanda's right to be placed in a nonabusive environment. *See id.* at

**12.** In *Doe v. Bobbitt*, 881 F.2d 510 (7th Cir. 1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 742 (1990), the Seventh Circuit held that it was not clearly established as of 1984 that the state child welfare workers had a duty to avoid knowingly placing a child with a relative who was dangerous. *Bobbitt* also indicates that, as of 1989, that right still was not clearly established. *Camp* involved placement with an aunt who was known to be an inadequate caretaker and a substantive due process violation was found to have been

stated, *Camp*, 67 F.3d at 1297–98, though the defendant was entitled to qualified immunity because the right had not been clearly established as of the time the conduct occurred, *id.* at 1298. *Camp* also indicates that there may be a distinction between children for whom DCFS has been appointed as a guardian and other children under DCFS supervision. Since that issue is not specifically raised by defendants regarding the period before DCFS was formally appointed as a guardian, it is not considered at this time.

1297–98. On the facts before the court, Young is not entitled to qualified immunity. The only possible conclusion on the facts ·alleged is that Amanda was in a dangerous environment; reasonable officials could not disagree on such a conclusion. The Count II claim against Young will not be dismissed.

Threatt argues that she cannot be liable as Young's supervisor. The basis of Threatt's liability, however, is not *respondeat superior*. It is alleged that Threatt had knowledge of the same facts as Young and that she joined in his decisions. Her liability is based on her own personal involvement. For the same reasons that Young is not entitled to dismissal of Count II, the Count II claim against Threatt will not be dismissed.

Hall did not enter into the case until January 14, 1997. The basis for his liability, though, is almost identical to Young. Hall initially had no knowledge of the dangers of the placement and, like Young, initially failed to conduct any investigation. Nevertheless, he subsequently was made aware of the danger represented by Reno, including when Hall received a psychiatric report in April. Nevertheless, Hall continued the placement with the Boes. Hall may be held liable for continuing the placement after he had knowledge of its danger. Count II as against Hall will not be dismissed.

■ Amanda's and Pilar's Count IV due process claims against the DCFS defendants will be considered next.[13] This consists of three separate contentions. The first contention is that defendants delayed too long in initiating a custody proceeding (the "delay" claim). Although

¶ 454 of the complaint indicates this claim is against all four DCFS defendants, the facts alleged show that only Young and Threatt can be responsible for the delay. Edmonds's involvement in Amanda's case ceased on October 11 and Hall did not become involved until after court proceedings were initiated.

Defendants cite *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983), for the proposition that a threat to a child's safety is justification for action first and a hearing afterward. Such a contention, however, does not address the "delay" claim plaintiffs make. Plaintiffs do not complain that they were denied a predeprivation hearing; plaintiffs complain that, after removing Amanda from her home, defendants did not act promptly enough to initiate court proceedings. *Lossman*, 707 F.2d at 290, holds that a parent has a liberty interest in the custody of his or her child that cannot be denied without due process.[14] *Lossman*, 707 F.2d at 292, also holds that a postdeprivation hearing in a custody matter must be prompt. In *Lossman*, 707 F.2d at 291–92, it was held that the plaintiff had no claim because there was an adequate basis for the emergency removal, a prompt hearing was provided, and, in any event, plaintiff suffered no injury because the state court found he was an unfit parent from whom his child should be removed. The facts alleged in the present case are to the contrary: there was not a sufficient basis for the initial removal, court proceedings were not initiated for more than two months, and the court eventually held that Amanda should be returned to Pilar. *Lossman* does not clearly define what is meant by prompt.

---

**13.** Paragraph 452 identifies the Boes as defendants to this claim. However, ¶ 454 identifies the different types of procedural due process claims raised as well as who is liable for each type of claim. The Boes are not mentioned in ¶ 454. It appears that their inclusion in ¶ 452 was a typographical error. The Count IV claims against them will be dismissed without prejudice.

**14.** *Lossman* leaves open the question of whether the child is also entitled to a due process claim. Since not specifically raised by defendants, the court is not required to independently take upon itself research of the question of whether Amanda's right to due process became clearly established between the 1983 *Lossman* decision and the 1996 incident involved in this case. It will be assumed that such right was clearly established as of 1996.

Plaintiffs cite *Weller v. Department of Social Services for Baltimore,* 901 F.2d 387, 396 (4th Cir.1990), which holds that four months without initiating any court proceedings is too long. Whatever the precise contours of "prompt" may be, no reasonably competent person would believe that a delay of more than two months in initiating court proceedings, absent special extenuating circumstances, is prompt. Plaintiffs may proceed on the Count IV due process "delay" claim against Young and Threatt.

Count IV also contains a "false information" claim that Young and Threatt knowingly presented false information to the State's Attorney when requesting the wardship proceeding and that Young knowingly testified falsely during the proceeding. Defendants argue that Young conducted an adequate investigation and relied on credible evidence of abuse. That contention, however, is contrary to the allegations of the complaint that Young conducted an incompetent investigation and knowingly relied on false information,[16] and therefore cannot be a basis for dismissing this claim.

 Citing *Millspaugh v. County Department of Public Welfare of Wabash County,* 937 F.2d 1172, 1175–76 (7th Cir.), *cert. denied,* 502 U.S. 1004, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991), defendants also argue they are entitled to immunity for their participation in the "prosecution" of the wardship proceeding.[17] There is absolute immunity for testifying in court. *Id.* The claim based on Young's allegedly false testimony will be dismissed. Plaintiffs argue that absolute immunity does not apply to the act of submitting a request to the State's Attorney to initiate a wardship hearing. In *Millspaugh,* 937 F.2d at 1176, it was held that absolute immunity did not apply to the caseworker's application for

the order initiating the case. That case, however, involved a different type of proceeding under Indiana law. There, the caseworker applied for an *ex parte* order enabling her to take the children into custody for purposes of presenting them at a hearing where it would be decided if the children were in need of services, which would then be a basis for placing them in a foster home. *See id.* at 1173. That is different than a request to the State's Attorney to initiate a wardship proceeding. Steps taken to initiate a child custody court proceeding are entitled to absolute immunity. *Id.* at 1176; *Potts v. O'Malley,* 1995 WL 745960 *3 (N.D.Ill.Dec. 1, 1995). The Count IV "false information" due process claim will be dismissed.

Last, Pilar claims that her procedural due process rights were violated by defendants' indicated finding and registration of that finding on the Central Register (the "findings" claim). Although Pilar raises this claim as to all four DCFS defendants, the facts alleged show that it could only pertain to Young and Threatt. Defendants' only apparent argument as to this claim is that they performed an adequate investigation and their determination was supported by credible evidence. Again, such an argument lacks merit because it is contrary to the allegations of the complaint. Defendants do not argue that such a claim is not a violation of due process and likewise plaintiffs do not point to case law clearly establishing the right that was violated. Because defendants do not raise an issue as to clearly established law, qualified immunity as to this claim need not be further considered at this time. The Count IV "findings" due process claim will be dismissed as to Edmonds and Hall, but may continue as to Young and Threatt.

---

16. Paragraphs 61 and 62 refer to Young submitting the false information. Again, other paragraphs allege that Threatt had the same knowledge and approved Young's conduct.

17. Defendants also rely on the immunities set forth in 325 ILCS 5/5 & 5/9. However, state

law immunities do not apply to § 1983 claims. *Jaworski v. Schmidt,* 684 F.2d 498, 500 (7th Cir.1982), *cert. denied,* 460 U.S. 1015, 103 S.Ct. 1258, 75 L.Ed.2d 485 (1983); *Evans v. Torres,* 1996 WL 5319 *5 (N.D.Ill. Jan. 4, 1996); *Jumes v. City of Chicago,* 1995 WL 613137 *3 (N.D.Ill. Oct.17, 1995).

Last to be considered is the Count III claim that all defendants interfered with Pilar's and Amanda's familial rights. Again, both sets of defendants argue that they relied on credible evidence of abuse. Again, those contentions are inconsistent with the facts alleged. Count III will not be dismissed.

IT IS THEREFORE ORDERED that CCPD defendants' motion to dismiss Counts I & III[18] is denied. DCFS defendants' motion to dismiss complaint [21] is granted in part and denied in part. The Count I claim as against Young and Threatt, the Count II claim as against Edmonds, the Count IV "delay" and "findings" claims as against Edmonds and Hall, and the Count IV "false information" claim as against all defendants are dismissed. As against Anita and Reno Boes, Count IV is dismissed in its entirety without prejudice. All discovery is to be completed by December 30, 1998. In open court, on October 8, 1998 at 9:15 a.m., the parties are to present a joint, written discovery plan covering any remaining written discovery (including disclosure of any expert reports) and setting forth names, dates, times, and locations for all depositions.