In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3905

NORMAN BERMAN, et al.,

Plaintiffs-Appellants,

v.

JACKIE YOUNG, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 1850--William T. Hart, Judge.

Argued June 7, 2001--Decided May 31, 2002

   Before Coffey, Easterbrook, and Rovner,
Circuit Judges.

   Rovner, Circuit Judge.  After reports of
possible child abuse, the Calumet City
Police Department (CCPD) removed Amanda
Hebein from her home, and the Illinois
Department of Children and Family
Services (DCFS) placed her with her
maternal grandparents. Amanda remained
with her grandparents for eight months
until a state court ordered her returned
to her mother and stepfather, Pilar and
Norman Berman. Amanda, along with Pilar
and Norman, filed this lawsuit under 42
U.S.C. sec. 1983 against employees of the
CCPD, DCFS, and her maternal grandparents
seeking damages for the wrongful
separation of Amanda from her parents.
The district court granted summary
judgment in favor of the defendants.
Amanda and her parents appeal, and we
affirm.

Background

   Amanda, born in December 1992, suffers
from cerebral palsy which affects, among
other things, her speech and motor
control. Relevant to this case, we note
that Amanda had a "moderately severe"
speech delay which significantly hindered
her ability to carry on a conversation.
Additionally, Amanda frequently fell and
sometimes had seizures that would result
in injury.

Prior to the incident that precipitated this lawsuit, Amanda lived with her mother, Pilar, and stepfather, Norman. Although Norman did not formally adopt Amanda, he had been involved with her care and upbringing since mid-1995. Pilar and Norman married in 1996, and they resided in a house owned by Pilar's parents, Reno and Anita Boe. Anita cared for Amanda during the day when Pilar was at work and occasionally watched Amanda on the weekends. Following a disagreement with the Boes about Amanda's care, however, Pilar enrolled her daughter in Tiny Town Day Care Center in April 1996.

Neither the Boes nor the employees at Tiny Town thought highly of Norman. On two separate occasions in 1996, both the Boes and Tiny Town had reported suspicions that Norman was abusing Amanda. Both times, however, DCFS determined the reports to be unfounded and, in the Boes' case, "harassing."

The series of events underlying this lawsuit began during the afternoon of October 11, 1996, when Amanda began crying after she wet herself at Tiny Town. Her caretaker, a woman called Lali, proceeded to comfort Amanda, but the child began crying, apologizing, and saying "no," "don't hit," and "no, Norman." While cleaning Amanda in the bathroom, Lali noticed four bruises, approximately two inches wide, on Amanda's back and bottom. Lali inferred, from Amanda's limited conversational skills, that Norman had inflicted the bruises on Amanda with a belt.

The Boes were scheduled to pick up Amanda at the end of the day, and when they arrived at Tiny Town, Lali showed Anita the bruises. The Boes took Amanda to the Bermans' residence as previously planned so they could wait for Pilar and Norman to return home.
In the meantime, Lali telephoned the DCFS Hotline to report the bruises she observed on Amanda and her suspicion that Norman caused the injuries. Because there were not enough DCFS investigators available that evening, the employee who answered the hotline call asked the CCPD to investigate, a proper procedure under DCFS rules.

Around 7:00 p.m. on the evening of October 11, two CCPD officers arrived at

the Bermans' residence to investigate the report of possible child abuse. When they arrived, Anita was still babysitting Amanda, who was watching television. Amanda did not appear to be in any pain and had not received any medical treatment for the bruises. The officers asked Amanda questions about Norman abusing her, to which Amanda responded affirmatively. Within ten minutes, the officers decided to take Amanda into protective custody based on the information from the hotline call, their observation of the bruises, and their conversation with Amanda. At the police station, additional officers, including a youth officer, questioned Amanda, and one officer spoke with Reno who mentioned that he previously had suspected and reported that Norman abused Amanda. No one made any effort to gather other corroborating information by contacting the Tiny Town employees, having Amanda examined by a doctor, or investigating Amanda's family or medical history.

DCFS authorized the CCPD officers to place Amanda temporarily with the Boes, and in turn the officers instructed Anita not to let Pilar take Amanda home. The Bermans returned home around 10:00 or 11:00 p.m. that evening and learned that Amanda was to remain at the Boes' residence because of accusations that Norman had abused her. The CCPD arrested Norman that evening and charged him with domestic abuse. He was arraigned the following day and released with a protective order prohibiting contact with Amanda.

Defendant Jackie Young,/1 an investigator in DCFS's Division of Child Protection, was assigned to perform an initial investigation of the case. He met with Pilar on October 12, although Pilar was still unaware of Amanda's bruises. Young was then off duty for several days, but on October 16 was assigned to conduct the formal investigation. Young interviewed a doctor and members of Amanda's extended family, but he did not meet with Amanda until 19 days after the abuse allegations, contrary to DCFS regulations requiring a visit within 24 hours. Young also failed to complete the required assessment of the appropriateness and safety of Amanda's placement with the Boes. Despite having been told by Pilar that Reno was violent,

Young failed to uncover a prior criminal complaint that Reno had attacked Anita. Further, DCFS files regarding the prior allegations of abuse contained information that Reno was a potential danger to Amanda. In mid-November, Young announced that he possessed credible evidence supporting a finding of abuse by Norman.

Defendant Sandy Threatt worked as a lead investigator for DCFS and served as Young's immediate supervisor. Threatt was aware of the delay in Young's meeting with Amanda, and she specifically ordered Young to see the child. During the investigation, Young informed Threatt of his belief that Norman posed a danger to Amanda and that she would be safe with the Boes. Ultimately, Threatt concurred in Young's assessment of abuse.

On December 23, 1996, a state juvenile court held a hearing at which Pilar, Young, and Amanda's guardian ad litem testified, and the court concluded that there was probable cause to believe that Norman had abused Amanda. The court also found that an "[i]mmediate and urgentnecessity does exist to support removal of the minor from the home." The court provided Norman and Pilar supervised visitation with Amanda and instructed them to attend parenting classes.

A few days after the court hearing, defendant Roy Hall, a DCFS social worker, was assigned to perform follow-up work on Amanda's case, including interviewing the parties, preparing a service plan with the ultimate goal of reuniting Amanda and her parents, and assessing the delivery of services. Although DCFS requires that service plans be developed within 30 days, Hall did not meet with the Bermans to begin follow-up until mid-February.

At that point, Hall scheduled parenting classes for the Bermans and explained the necessary steps to regain custody of Amanda. Although he encouraged visitation with Amanda, he was unresponsive to Pilar's complaints that the Boes prevented the court-ordered visitation. After an unannounced visit to the Boes' home during which Hall observed Amanda speaking quite comfortably with Norman over the telephone, Hall began questioning Reno's insistence that Amanda

was afraid of Norman. Hall ordered an additional psychological assessment of Amanda, the Bermans, and the Boes, but it did not begin until April 1997.

The assessment of the family revealed that the Boes were indoctrinating Amanda against her parents. Reno would accuse Norman, in graphic detail and in Amanda's presence, of sexually abusing Amanda. Moreover, he appeared to be highly disturbed, with paranoid thoughts and bizarre behavior. The evaluation also documented that Anita was depressed and that she told Amanda that Pilar did not love her.

As a result of the information gleaned from this evaluation, the state juvenile court entered a protective order prohibiting Reno from having contact with Amanda. Reno moved out of the house, but Amanda remained with Anita because the court, on the advice of Hall and Amanda's guardian ad litem, believed that it would be upsetting to return her to Pilar at that time.

On June 17, 1997, the state court held another hearing and ultimately returned Amanda to the custody of Pilar and Norman under court supervision. Later, in November, the court terminated its supervision on Hall's recommendation and assessment that Amanda would be safe with the Bermans. Finally, in February 1998, DCFS voluntarily entered an order providing that the abuse report against the Bermans was unfounded because it was unclear who was responsible for Amanda's bruises.

On March 25, 1998, Amanda and her parents filed a complaint against four CCPD police officers, four DCFS workers, and Reno and Anita Boe. Their later amended complaint raised nine claims for relief, including a Fourth Amendment claim, several due process claims, and five state-law tort claims against the Boes. The district court entered judgment in favor of all defendants, and Amanda and the Bermans appeal.

Analysis

On appeal only three due process claims against three of the DCFS defendants are at issue: a substantive due process claim against Young, Threatt, and Hall for

placing Amanda in a dangerous environment; a substantive due process claim against Young and Threatt based on the violation of Amanda and Pilar's family association and autonomy rights; and a procedural due process claim against Young and Threatt focusing on the delay in the DCFS proceedings. We review the district court's judgment de novo, drawing all inferences in favor of Amanda, Pilar, and Norman. Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002).

1. Dangerous Placement Claim

Amanda asserts that Hall, Young, and Threatt violated her substantive due process rights by placing her with the Boes, an environment the defendants should have known was dangerous, and by failing to investigate Reno's history of violence. The complaint further alleges that, as a result of her placement with the Boes, Amanda suffered emotional disturbance, developed extensive tooth decay, became obese, and received inadequate medical care that exacerbated her cerebral palsy.

Relying on the Rooker-Feldman doctrine, the district court dismissed this claim on jurisdictional grounds as to Hall. The Rooker-Feldman doctrine precludes a lower federal court from exercising jurisdiction over a claim that would require it to review a final judgment of a state court. Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923); District of Columbia Ct. of App. v. Feldman, 460 U.S. 462 (1983). The state juvenile court, at its December 1996 hearing, found probable cause to support a finding of abuse and removal of Amanda from the home. The district court concluded that this judgment implicitly approved the placement of Amanda with the Boes, and that as to this claim a finding against Hall, who became involved in Amanda's case only after the hearing, would necessarily imply that the state-court ruling was incorrect.

The district court concluded, however, that the Rooker-Feldman analysis did not apply to Young and Threatt because their responsibility for Amanda's well-being predated the state-court hearing. Instead, the district court granted summary judgment to Young and Threatt

because there was insufficient evidence that Amanda's developmental delays and emotional troubles were reasonably foreseeable to Young and Threatt based on information they had or should have discovered.

On appeal Amanda argues that the district court's Rooker-Feldman analysis regarding Hall was erroneous because Amanda's injuries were not caused by the state-court decision but rather were prior injuries that the state court failed to remedy. With respect to Young and Threatt, Amanda asserts that the likelihood of injury was reasonably foreseeable based on information the DCFS employees possessed, even if the specific injuries she suffered could not have been predicted. We conclude that Amanda cannot prevail on this claim because she failed to establish causation.

In general, a state's failure to protect an individual from private injury does not violate the mandate of due process. DeShaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189, 196-97 (1989). In situations where the state has established a special relationship to the victim, however, the state does have an affirmative duty to protect the individual. Id. at 198-99. This exception is grounded in the restrictions that the state places on the individual by restraining personal liberty in some manner. Kitzman-Kelley v. Warner, 203 F.3d 454, 457-58 (7th Cir. 2000). Recognizing the "special relationship" exception to the general DeShaney rule, we have held that once a state removes a child from her parents' custody, it has sufficiently restrained the liberty of the child and therefore assumes a duty of safekeeping. K.H. v. Morgan, 914 F.2d 846, 849 (7th Cir. 1990). As such, state actors may be held liable for damages "when they place a child in a foster home knowing or having reason to know that the child is likely to suffer harm there." Camp v. Gregory, 67 F.3d 1286, 1293 (7th Cir. 1995) (collecting cases from other circuits).

To have survived summary judgment on her claim for damages resulting from her placement with the Boes, Amanda was required to produce evidence that she sustained actual injury and that her injuries had a causal connection with the

alleged due process violation. Smith v. City of Chicago, 913 F.2d 469, 472 (7th Cir. 1990); Lossman v. Pekarske, 707 F.2d 288, 290-91 (7th Cir. 1983). Amanda theorizes that the DCFS defendants failed to address Pilar's accusation that Reno was violent and had once been investigated for allegedly attacking Anita. As the district court noted, DCFS files regarding prior abuse allegations contained information suggesting that Reno might pose a danger to Amanda. Indeed, Amanda maintains that she suffered injury at the hands of the Boes as evidence by her orthopedist's opinion that a lack of treatment while she stayed with them worsened her condition. Additionally, the psychotherapist who evaluated Amanda and her family testified that Amanda suffered post-traumatic stress from her time with the Boes.

But what is missing is causation. The emotional troubles and developmental delays Amanda suffered are unrelated to the hidden criminal history she claims DCFS ought to have discovered. There is no suggestion, for example, that her orthopedic condition would not have declined and she would not have suffered stress and anxiety from the separation from her mother had the DCFS agents uncovered the prior criminal complaint against Reno. Neither did Amanda offer any evidence before the district court that placement with someone other than the Boes would have prevented the injuries she alleged. Accordingly, she has not established a causal connection between the alleged inadequate investigation by Young, Threatt, or Hall and the damages she is asserting in this sec. 1983 claim. See, e.g., Camp, 67 F.3d at 1297.

2. Familial Rights Claim

Amanda and Pilar raised a sec. 1983 claim for "violation of substantive due process rights to family association, family autonomy, family integrity, and family privacy." They assert that Young and Threatt lacked a rational and reasonable basis to continue Amanda and Pilar's separation for over eight months. Specifically, Amanda and Pilar challenge Young's failure to see Amanda until 19 days after she was removed from her home, his delayed investigation, and the lack of corroboration of abuse.

The district court disagreed with the plaintiffs and held that Young had an adequate basis for his suspicion that Norman abused Amanda: Young received descriptions of the bruises and of Amanda's limited conversation in response to questions from the Tiny Town workers and CCPD officers; he knew that criminal charges had been filed against Norman for the alleged abuse; and when he did observe Amanda, he found marks consistent with prior abuse. Further, although Young had no information that Pilar posed a danger to Amanda, he also knew that Pilar was still living with Norman. He therefore recommended that Amanda remain outside her home, but he did not prevent Pilar from visiting Amanda. The district court assumed that Threatt, as Young's supervisor, shared Young's knowledge and participated jointly in the decision-making process, and so it applied the same analysis to the claim against Threatt.

On appeal Amanda and Pilar maintain that Young and Threatt's continuation of the family separation was unconstitutional because Young conducted very little investigation, and certainly not enough, they claim, to support a reasonable suspicion of abuse. Additionally, Amanda and Pilar argue that the scope of the DCFS intervention was overbroad given the circumstances. Young and Threatt seek to support the district court's grant of summary judgment by relying on qualified immunity.

Qualified immunity shields from liability government actors performing discretionary functions so long as they do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 456 U.S. 800, 818 (1982); Kelley v. Myler, 149 F.3d 641, 648 (7th Cir. 1998). The Supreme Court has counseled that the best framework for analyzing a qualified immunity defense is to first determine if there has been a constitutional violation and then to consider whether the constitutional right at issue was clearly established at the time of the violation. Conn v. Gabbert, 526 U.S. 286, 290 (1999); County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998). See also Kitzman-Kelley, 203 F.3d at 457.

The constitutional violation alleged is an infringement on due process rights to family association and privacy. Parents have a fundamental due process right to care for and raise their children, and children enjoy the corresponding familial right to be raised and nurtured by their parents. Troxel v. Ganville, 530 U.S. 57, 65-66 (2000); Brokaw v. Mercer County, 235 F.3d 1000, 1018-19 (7th Cir. 2000) (citing cases and tracing the development of the familial rights). However, these rights to family integrity are not absolute.  Brokaw, 235 F.3d at 1019; Wilkinson v. Russell, 182 F.3d 89, 103-04 (2d Cir. 1999). The family's due process interests must be balanced against the government's interest in protecting children from abuse when it has "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse."  Brokaw, 235 F.3d at 1019; Croft v. Westmoreland County Children and Youth Servs., 103 F.3d 1123, 1126 (3d Cir. 1997).

Based on our review of the record, Amanda and Pilar failed to produce evidence creating a genuine issue of fact as to the reasonableness of Young and Threatt's suspicions of abuse. The district court was correct in determining that Young and Threatt had a reasonable basis for their belief that Amanda was being abused and needed to be removed from her home. Young and Threatt reasonably relied on reports from Tiny Town workers about the bruises and on the comments Amanda made in response to questioning concerning the bruises. The CCPD officers also documented their observations of the bruises and Amanda's answers to their questions about Norman. Although details in the descriptions of the bruises differed, all of the Tiny Town employees and the CCPD officers involved agreed that the bruises were consistent with abuse. Moreover, Young and Threatt were aware that criminal charges had been filed against Norman. Finally, on October 30, Young personally observed marks on Amanda that could be consistent with prior abuse. Given this background, it was reasonable for Young and Threatt to suspect abuse.

Even assuming a constitutional violation, however, the second phase of

our analysis--determining whether the constitutional right was clearly established--requires us to conclude that Young and Threatt are entitled to qualified immunity. Amanda and Pilar assert that Young and Threatt failed to conduct an adequate investigation and that their decision to remove Amanda from her home was overbroad given the accusations that only Norman (and not Pilar) abused Amanda. To the extent that Young and Threatt's investigations ought to have been more detailed or they ought to have considered more limited measures than removing Amanda from the home, neither the extent of their obligations, nor the extent of the right to family integrity and association, were so well-developed as to place them on notice that their actions were unlawful. See Brokaw, 235 F.3d at 1023 ("[B]ecause the balance between a child's liberty interest in familial relations and a state's interest in protecting the child is nebulous at best, social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely--if ever--be clearly established.").

3. Delayed Hearing Claim

Amanda and Pilar raised a procedural due process claim based on the failure of Young and Threatt to initiate a post-deprivation judicial hearing to determine the legality of Amanda's removal from the home until December 23, 1996, over two months after she was seized. In ruling on the defendants' earlier motion to dismiss, the district court concluded that the 72-day delay violated the constitutional requirement of a prompt judicial hearing. Hebein v. Young, 37 F. Supp. 2d 1035, 1046-47 (N.D. Ill. 1998). Ultimately, however, the district court granted summary judgment to Young and Threatt because the plaintiffs offered no evidence that a prompt hearing would have yielded a different outcome than the December 23 hearing.

On appeal Amanda and Pilar assert that a timely post-deprivation hearing would have been accompanied by a contemporaneous medical examination, whereas the December 23 hearing lacked any testimony from a medical professional. The district court reasoned

that, although an earlier hearing would have allowed for medical testimony regarding Amanda's bruises, there was already testimony from witnesses that the bruises were consistent with abuse and one more person testifying to that same conclusion would not have changed the outcome of the hearing. Amanda and Pilar challenge the district court's inference that a medical professional would necessarily have concurred with the assessment of the lay people who saw Amanda's bruises. Specifically, the plaintiffs identify Dr. William Morris, Amanda's pediatrician, who examined Amanda two weeks after the alleged abuse and opined that her bruises could be consistent with falling down, a consequence of her cerebral palsy.

A procedural due process claim such as this one is premised on Supreme Court holdings that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 42 U.S. 319, 333 (1976). The amount of process due--that which constitutes "meaningful"--varies depending upon the particular circumstances involved. Id. at 334. When the state removes a child from her parents, due process guarantees prompt and fair post-deprivation judicial review. Brokaw, 235 F.3d at 1021.

The district court determined that the state court hearing, held on December 23, 1996, was not "prompt." Hebein, 37 F. Supp. 2d at 1047. We agree that the delay in the proceedings was rather outrageous. In order for Amanda and Pilar to prevail on this claim, however, they must establish, "with some degree of probability," that a timely hearing would have prevented the extended infringement on their familial rights. Lossman, 707 F.2d at 291. In other words, they must demonstrate actual damages resulting from the delay in the post-deprivation hearing. Donald, 836 F.2d at 380; Lossman, 707 F.2d at 291.

Our review of the evidence at summary judgment compels us to conclude that Amanda and Pilar cannot pass this hurdle. Although they protest the lack of medical testimony at the December 23 hearing, they have offered no reason why they failed to solicit a medical examination

shortly after the abuse allegations. Moreover, it appears from the record that Young testified at the hearing that Dr. Morris found no evidence of abuse. Amanda and Pilar cannot demonstrate any injury resulting from the delayed hearing, especially given that the state court approved the removal of Amanda from her home. Without actual damages, they cannot prevail on this claim. See Lossman, 707 F.2d at 291.

Conclusion

   For the foregoing reasons, we affirm the judgment of the district court.

FOOTNOTE

/1 Jackie Young passed away after this suit was filed. His estate remains a party by its representative, Bruce A. Boyer.