148 F.3d 692
 Travis S. HAMMOND, Plaintiff-Appellee,
v.
Randall KUNARD, Bruce Harmening, and Lawrence Wait, officers
and agents of the United States Marshal Service, Internal
Revenue Service and adjunct officers of the Drug Enforcement
Administration in their individual capacities, Defendants-Appellants.
 No. 96-2343.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 10, 1998.
Decided June 11, 1998.
 
 John H. Bisbee (argued), Macomb, IL, for Plaintiff-Appellee.
 James A. Lewis (argued), Office of the United States Attorney, Springfield, IL, for Defendants-Appellants.
 Before POSNER, Chief Judge, and BAUER and KANNE, Circuit Judges.
 BAUER, Circuit Judge.
 
 
 1
 In this case, the defendants, who were employed (at least at the times relevant to this case) by various law enforcement agencies, appeal from the district court's denial of their motion to dismiss the plaintiff's complaint based on the doctrines of absolute and qualified immunity. Because we find no error with the district court's decision, we affirm.
 
 BACKGROUND
 
 2
 The relevant facts we have gleaned from the First Amended Complaint (a whopper, weighing in at 19 pages and 45 paragraphs), which we presume to be true for purposes of the motion to dismiss, are as follows.[1] At the times relevant to this case, plaintiff Travis Hammond ("Hammond") operated a farm located in Hancock and Schuyler Counties, Illinois. Defendant Randall Kunard ("Kunard") was an employee of the McDonough, Illinois, County Sheriff's Office who was on assignment with the Illinois State Police, Department of Criminal Investigation. Defendant Bruce Harmening ("Harmening") was an officer and agent of the United States Drug Enforcement Administration, and defendant Lawrence Wait ("Wait") was an agent of the Internal Revenue Service. In approximately November 1990, Harmening, Wait, and Kunard (collectively "the defendants") became involved in a federal drug enforcement exercise, dubbed "Operation Cowboy," which sought to track down and prosecute drug manufacturers, smugglers, and dealers in Western and Central Illinois. During the course of the operation, the defendants apprehended Randy Mustread ("Mustread") and charged him with various offenses stemming from his having brought large quantities of drugs from Texas into Illinois. Because Mustread had a long criminal history and faced a substantial amount of time in jail if convicted, the defendants urged Mustread to assist them in "Operation Cowboy" and assured him that any assistance he gave would be to his benefit.
 
 
 3
 Mustread agreed to cooperate, and met with Harmening and other agents on December 4, 1990, for a "debriefing." During this meeting, Mustread detailed a marijuana conspiracy in which he and Ramiro Adames, Dwight Bookout, Dennis Finch, Robert Lynn Jones, and Jimmy Cook procured and shipped large amounts of marijuana in Texas and brought it to central Illinois for distribution. The agents reduced this information to writing and believed it to be truthful. In subsequent meetings with the agents, Mustread related that he had previously rented a shed from Hammond, which was located on Hammond's farm, for the purposes of storing a camper. Mustread also stated that, without Hammond's knowledge, he had stored some of the marijuana brought up from Texas in the camper while it was in the shed. Between December 4, 1990 and October 21, 1991, Mustread was debriefed a total of 10 times by the agents but never implicated Hammond in any illegal activity.
 
 
 4
 According to the complaint, the defendants became aware after these initial meetings with Mustread that he was seeking financial support for his wife and children and also medication to help ease violent outbursts which he was experiencing due to being deprived of drugs on which he was dependent. In approximately February 1991, Mustread was given prescriptions for various addictive tranquilizers which were to be paid for by county jail personnel pursuant to an authorization by Harmening. Mustread became addicted to the medications. Knowing that Mustread was dependent on them for a continued supply of drugs, Harmening and other agents informed Mustread of the civil forfeiture process by which the government seizes property used in the commission of drug offenses. Thereafter, on or about October 21, 1991, Mustread gave another detailed debriefing to Harmening concerning the marijuana conspiracy, this time implicating Hammond. Mustread informed Harmening that Hammond knew that marijuana was being stored at his farm, had participated in the delivery of marijuana to one of Mustread's customers, and had agreed to grow marijuana on his farm.
 
 
 5
 With this new information in hand, Harmening told Hammond that Kunard and Wait wanted to interview him, to which Hammond agreed. On December 3, 1991, Hammond met with the defendants and was questioned about his dealings with Mustread and other members of the conspiracy. Hammond related that he knew nothing about any illegal activity, but acknowledged that he allowed Mustread to store a camper in a shed on his farm and that he had gone to Texas with Mustread in 1987 to purchase a car from Bookout. During the interview, Agent Wait took notes which show that Hammond gave an exculpatory account of his involvement with the conspiracy; in the report of the meeting, however, the agents stated that Hammond had a history of involvement in the drug business and had assisted Mustread in bringing marijuana from Texas to Illinois. Subsequently, based on Mustread's testimony, the false report, and various threats and promises, the defendants induced others, including Bookout, to make statements which falsely implicated Hammond in the drug trade.
 
 
 6
 Harmening and Wait prepared the evidence they had gathered, which was submitted to a federal grand jury. On December 18, 1992, the grand jury returned an indictment against Hammond, in which he was charged with conspiracy to distribute marijuana. The indictment was amended on March 17, 1993, and added charges of manufacturing marijuana and money laundering against Hammond. Pursuant to the indictment, the defendants seized Hammond on January 2, 1992. Hammond was released on bail, but subject to many restrictions, including abstaining from alcohol, participating in a drug treatment program, submitting to weekly urine tests, and avoiding contact with certain individuals, including his son. On April 11, 1994, Hammond went to trial. The jury acquitted Hammond of the money laundering and drug manufacturing counts but was unable to reach a verdict on the conspiracy count. A mistrial was declared on the conspiracy count, and it was dismissed with prejudice by the district court on June 24, 1994.
 
 
 7
 On November 3, 1992 (after the first indictment had been returned against Hammond but before it was amended), Harmening verified a complaint alleging that Hammond's farm was used as an instrumentality in violation of federal narcotics laws and was subject to forfeiture to the United States. Pursuant to this complaint, federal agents seized Hammond's property on November 25, 1992. On July 11, 1994, after all of the criminal charges against Hammond had been resolved in his favor, the United States moved to dismiss the forfeiture action, which the district court granted the next day.
 
 
 8
 On August 11, 1994, Hammond filed this constitutional tort suit, pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), against Kunard, Harmening, and Wait. In Count I of the Complaint, Hammond asserted that the defendants, without any objectively reasonable basis for believing that he had violated any United States laws, violated the rights guaranteed him under the Fourth, Fifth, and Sixth Amendments to the United States Constitution. Specifically, Hammond claimed that the following rights were violated: (1) his liberty interest (secured by the probable cause standard of the Fourth Amendment and the grand jury clause of the Fifth Amendment) in being free from prosecution and seizure based on fraudulently induced and manufactured evidence without which no objectively reasonable basis or probable cause existed; (2) his right to be free from prosecution instituted on the basis of knowingly false, improperly induced, and fraudulently manufactured evidence (as secured by the due process clause of the Fifth Amendment and the confrontation clause of the Sixth Amendment); and (3) the right to not be deprived of property without due process (secured by the due process clause of the Fifth Amendment). In Count II, Hammond asserted that the actions of the defendants caused him to default on payments on his farm, resulting in a foreclosure action being filed against him by the party that sold him the land.[2]
 
 
 9
 On April 17, 1995, the defendants moved to dismiss the complaint. They argued that: (1) any testimony they gave before a grand jury or petit jury is absolutely privileged; (2) their actions in investigating, and ultimately seizing, Hammond are protected by qualified immunity; and (3) Hammond cannot bring suit against them on the basis of the abandoned civil forfeiture because the district court's issuance of a certificate of reasonable cause precludes such an action. This motion was referred to Magistrate Judge Robert Kauffman, who issued a report and recommendation in January 1996 recommending that the motion to dismiss be denied. The defendants filed objections with the district court, but on March 7, 1996, Chief Judge Michael Mihm denied the objections and adopted the report and recommendation. The defendants unsuccessfully sought reconsideration of the district court's decision, and on May 28, 1996, filed a notice of appeal with this court.
 
 DISCUSSION
 
 10
 On appeal, the officers assert that the district court erroneously found that their actions in the underlying criminal investigation and prosecution of Hammond were not entitled to either absolute or qualified immunity. Before we can examine the merits of these arguments, a jurisdictional question must first be addressed.
 
 I. Jurisdiction
 
 11
 This appeal is before us on the district court's denial of the defendants' motion to dismiss the plaintiff's complaint. Ordinarily, the denial of a defendant's motion to dismiss is not an appealable order. United States v. Furlett, 974 F.2d 839, 842 (7th Cir.1992). When the denial of a motion to dismiss which is predicated on a claim of qualified immunity "turns on an issue of law," however, "it is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Behrens v. Pelletier, 516 U.S. 299, 116 S.Ct. 834, 838-39, 133 L.Ed.2d 773 (1996) (citing Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)); Khuans v. School Dist. 110, 123 F.3d 1010, 1013 (7th Cir.1997). Similarly, the denial of a "substantial claim" of absolute immunity is appealable before final judgment has been entered. Mitchell, 472 U.S. at 525, 105 S.Ct. 2806. Such denials are appealable because qualified (as well as absolute) immunity is an entitlement not to stand trial, not just a defense to liability, and is effectively lost if a case is erroneously permitted to go to trial. Mitchell, 472 U.S. at 526, 105 S.Ct. 2806; Khuans, 123 F.3d at 1013 (citing Behrens, 516 U.S. 299, 116 S.Ct. at 839-40, 133 L.Ed.2d 773). Since this is a motion to dismiss, we assume that all of the facts of the complaint are true, rendering the applicability of qualified (or absolute) immunity a purely legal question over which we have jurisdiction. Khuans, 123 F.3d at 1013. Accordingly, we proceed to the defendants' contentions, examining them de novo.
 
 II. Absolute Immunity
 
 12
 The defendants first argue, as they did in the district court, that they are entitled to absolute immunity insofar as Hammond's complaint alleges that they gave false testimony before both a grand jury and a petit jury. Magistrate Judge Kauffman found that, under Briscoe v. LaHue, 460 U.S. 325, 326, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), the defendants were absolutely immune for such conduct. Nevertheless, the report and recommendation concluded that the defendants' motion should be denied as to absolute immunity because "the complaint alleges conduct beyond just testimony by the agents" and did not fall within the scope of Briscoe. The district court agreed, adopting Magistrate Judge Kauffman's recommendations without comment, and later denied the defendants' motion to reconsider the issue of absolute immunity, stating that "Hammond does not merely claim that Defendants committed perjury, for which they would be immune." We agree with these assessments.
 
 
 13
 In his brief, Hammond states that giving false testimony before juries is "the least of what Hammond has charged the defendants" with. See Appellee's Brief at 36-37. Indeed, the complaint focuses on the defendants' actions prior to the prosecutor's decision to take the case to the grand jury, not on their actual testimony on the matter. Since it appears that the allegation that the defendants presented false evidence to the grand and petit juries is only part and parcel of Hammond's broader claims, the district court did not err in denying the defendants' motion. As the case develops and Hammond's theories begin to crystalize, the district court may be warranted in taking further action; at present, however, the allegations in the complaint put this case outside of a simple witness-immunity inquiry.[3]
 
 III. Qualified Immunity
 
 14
 The appellants next argue that their actions are protected by qualified immunity. The doctrine of qualified immunity generally shields officials who perform discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted). Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. Hinnen v. Kelly, 992 F.2d 140, 142 (7th Cir.1993) (citing Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). In determining whether a law is clearly established, we look to see "whether the law was clear in relation to the specific facts confronting the public official when he or she acted." Lanigan v. Village of East Hazel Crest, Ill., 110 F.3d 467, 472 (7th Cir.1997) (quoting McDonnell v. Cournia, 990 F.2d 963, 968 (7th Cir.1993)). If the law was clearly established, the immunity defense should ordinarily fail because a reasonably competent officer should know the law governing his conduct. Harlow, 457 U.S. at 819, 102 S.Ct. 2727.
 
 
 15
 The defendants do not challenge that there is a clearly established right to be free from arrests which lack probable cause. Rather, they focus on whether reasonable officers could have reasonably engaged in the same conduct, a finding which would establish that qualified immunity is appropriate here. The defendants latch on to one sentence of the Magistrate Judge's report and recommendation, asserting that he applied an incorrect standard in denying the motion to dismiss. In his report, the Magistrate stated that "[w]hile reasonable officers might disagree as to whether to believe Mustread's testimony, the complaint alleges that the defendants knew that the testimony was not true and encouraged Mustread to continue to implicate Hammond, knowing that his testimony was false." See Magistrate's Report and Recommendation at 5.
 
 
 16
 Both at oral argument and in their brief, the defendants confuse the "objective/subjective" concept as it applies to qualified immunity. Before Harlow, courts applied both an objective and a subjective test to this "good faith" defense. Accordingly, qualified immunity would be defeated if an official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury...." Harlow, 457 U.S. at 815, 102 S.Ct. 2727 (quoting Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)). In Harlow, the Court recognized that the subjective element had frequently proved incompatible with the notion that insubstantial suits should not proceed to trial, and concluded that the limits of qualified immunity should be defined solely in objective terms. Id. at 817-19, 102 S.Ct. 2727. The fact that the Supreme Court scuttled the subjective test, however, does not mean that all subjective factors must be ignored in the qualified immunity context. Information possessed by an officer, for example, may be relevant to the inquiry. The Court stated, in situation analogous to the present case, that:
 
 
 17
 It follows from what we have said that the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials. But contrary to the [Respondents'] assertion, this does not reintroduce into qualified immunity analysis the inquiry into officials' subjective intent that Harlow sought to minimize.... The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed [Petitioner's] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. [Petitioner's] subjective beliefs about the search are irrelevant.
 
 
 18
 Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). It is therefore appropriate for the court to look at what the defendants knew at the time of the alleged constitutional deprivation to see if they acted "reasonably."
 
 
 19
 In his complaint, Hammond asserts that the defendants encouraged Mustread and others to fabricate testimony implicating him in the drug conspiracy so that he could be prosecuted and the government could institute civil forfeiture proceedings against his farm. They did so, according to the complaint, by getting Mustread hooked on drugs which he could only get from the defendants, by turning exculpatory statements made by Hammond into admissions that he was involved in the conspiracy, and by using various threats and promises to get other defendants to provide false information about Hammond. The officers did this, according to the complaint, despite the fact that they knew that Hammond was not involved in the conspiracy. Taking these allegations as true, as we must on the motion to dismiss, there is no way an officer could reasonably believe that he was not violating Hammond's constitutional rights when he gathered the evidence together and used it to implicate Hammond.
 
 
 20
 The defendants attack this conclusion, arguing that even if they "knew" the evidence was false when they passed it on, it is of no moment. According to the defendants, if a "reasonable officer" could believe and use the information, he is entitled to qualified immunity. Because this court has accepted Mustread's testimony as credible (in appeals from some of the conspirators' criminal convictions) and because reasonable officers could disagree on whether to believe Mustread, the defendants conclude, they are entitled to qualified immunity. See Appellant's Brief at 27-28. Whether Mustread's testimony, examined in a vacuum, could be believed by a reasonable person is not the correct inquiry, however. The complaint alleges that the defendants knew that his testimony was false but used it anyway (and, even further, alleges that the defendants induced Mustread to give the false testimony in the first place). Looking at what the officers knew at the time of the alleged constitutional deprivation does not constitute a "subjective" test for qualified immunity. We are not looking at the motives for engaging in the questioned conduct, but rather at the information before the officer when he ascertained whether his conduct would violate a clearly established constitutional right. This is part of the objective reasonableness inquiry, not a subjective inquiry into an officer's motives, and the defendants' arguments to the contrary are incorrect.
 
 
 21
 Alternatively, the defendants assert that the district court should determine, before discovery, whether there was probable cause or reasonable mistake in the information presented to the grand jury. We express no opinion on the merits of this suggestion, but leave it to the district court's discretion to schedule any proceedings it deems appropriate.
 
 
 22
 In sum, the district court applied the correct standard in this case and did not err by looking at what the defendants are purported to have known at the time they allegedly violated Hammond's constitutional rights. The allegations in the complaint demonstrate that no reasonable officers, knowing what the defendants are alleged to have known, could have believed that they were acting in accordance with Hammond's clearly established constitutional rights.[4]
 
 IV. Certificate of Reasonable Cause
 
 23
 The defendants also claim that the certificate of reasonable cause issued by the district judge in the civil forfeiture action brought against Hammond's farm insulates them from suit with respect to Count II of the complaint. A district court is authorized to issue a certificate of reasonable cause pursuant to 28 U.S.C. § 2465, which states:
 
 
 24
 Upon the entry of judgment for the claimant in any proceeding to condemn or forfeit property seized under any Act of Congress, such property shall be returned forthwith to the claimant or his agent; but if it appears that there was reasonable cause for the seizure, the court shall cause a proper certificate thereof to be entered and the claimant shall not, in such case, be entitled to costs, nor shall the person who made the seizure, nor the prosecutor, be liable to suit or judgment on account of such suit or prosecution.
 
 
 25
 While this issue was raised below, neither the magistrate nor the district court discussed it in their respective orders.
 
 
 26
 Keeping in mind the limited scope of jurisdiction we have over this appeal, we decline to address the issue of whether the certificate of reasonable cause issued in this case requires that Count II of the complaint be dismissed. While the issues of qualified and absolute immunity are properly before us on appeal, the appellants have not made a showing that the denial of a motion to dismiss based on a certificate of reasonable cause can properly be the basis for appeal. While the existence of such a certificate bars the commencement of a suit against certain officials involved in a civil forfeiture action, no argument has been presented to show that it is analogous to immunity from suit and susceptible to interlocutory review by this court. Therefore, we decline to reach the issue here.[5]
 
 CONCLUSION
 
 27
 The district court correctly found that the complaint in this case alleges facts which, when taken as true, show that the defendants are not entitled to either absolute or qualified immunity at this stage of the proceedings. The issue of the certificate of reasonable cause is not properly considered by this court at the present time. Accordingly, we AFFIRM the district court's denial of the defendants' motion to dismiss.
 
 
 
 [1]
 In the appendix to his brief, Hammond included a copy of his Second Amended Complaint, dated December 30, 1994. The district court docket, however, reflects that Judge Mihm denied Hammond's motion to file this complaint. See District Court Docket, entry 25
 
 
 [2]
 Tom, Bill, and Jim Clayton, the heirs of the person from whom Hammond had purchased his farm on a contract basis, were previously dismissed as parties from this case
 
 
 [3]
 Hammond also argues that, as complaining witnesses, the defendants would not be entitled to absolute immunity in any event. We decline to reach this argument at present, as it appears to involve factual matters beyond the scope of our present jurisdiction
 
 
 [4]
 The defendants also address a number of arguments to specific claims which could be contained in Hammond's complaint, such as a violation of Hammond's Fifth Amendment rights under the grand jury clause. We believe that the district court is in a better position to weed out any unsubstantiated claims as the case progresses, and we decline to address these issues
 
 
 [5]
 We note that, at oral argument, Hammond's counsel acknowledged that Hammond's damages on this claim are de minimis and that he would not pursue de minimis damages