2010 OK 5

ESTATE OF Eva June CROWELL, Deceased, by and through Anna M. BOEN, Personal Representative, Plaintiff/Appellant,

v.

BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF CLEVELAND, State of Oklahoma, Dewayne Beggs, as Sheriff of Cleveland County, State of Oklahoma; Deputy Jeanne Ann Beck; Deputy Kenneth Albrecht; and Corporal Michael Stevenson, Employees of the Cleveland County Sheriff's Office, Defendants/Appellees,

and

Deputy April Lynn Cummins and Corporal Michael Dean Easley, Defendants.

No. 106,374.

Supreme Court of Oklahoma.

Jan. 26, 2010.

Rehearing Denied July 1, 2010.

Albert J. Hoch, Jr. and Jeffrey S. Coe, Oklahoma City, OK, for Plaintiff/Appellant.

David W. Lee, Lee Law Center, P.C., Oklahoma City, OK, for Defendants/Appellees.

David J. Batton, Assistant District Attorney, Norman, OK, for Defendant/Appellee Board of County Commissioners.

REIF, J.

¶ 1 Eva June Crowell died following an acute asthma attack that she suffered while incarcerated in the Cleveland County Jail. At the time of the attack, jail personnel had possession of Ms. Crowell's inhaler. The personal representative of her estate has alleged that the jail personnel unnecessarily delayed furnishing Ms. Crowell the inhaler after being notified of her emergency need for it. The personal representative contends that this delay caused Ms. Crowell's death and violated her civil rights. Personal representative seeks damages from the Board of County Commissioners of Cleveland County, the Sheriff of Cleveland County and the jail employees on duty at the time of the asthma attack.

¶ 2 The defendants moved for summary judgment. They contended the delay in providing the inhaler was not actionable under § 1983, because the delay did not involve deliberate indifference to the serious medical needs of a prisoner. Defendants supported this contention with evidentiary materials that showed a jail employee arrived with the inhaler at Ms. Crowell's cell pod around four minutes after the emergency call. At that point, Ms. Crowell had stopped breathing and could not use the inhaler.

¶ 3 In response, the personal representative presented evidentiary material showing that the decedent's cell mate told jail employees that the decedent was in emergency distress up to twenty minutes or more prior to the time when the jail employee arrived with the inhaler; that a head count was continued after notification of the emergency; and that by the time a sheriff's employee arrived with the decedent's inhaler, the decedent could not use the inhaler because she was no longer breathing.

¶ 4 Although finding the personal representative's evidentiary material raised a question of fact as to the negligence of the sheriff's office, the trial court ruled it did not show deliberate indifference or raise a question of fact sufficient to withstand a demurrer to the evidence or motion for directed verdict on the issue of deliberate indifference. The trial court granted summary judgment for defendants. The Court of Civil Appeals agreed that the record showed no dispute of material fact regarding deliberate indifference, and affirmed.

¶ 5 Upon certiorari, we have considered the evidentiary material in the light most favorable to the personal representative and hold that material questions of fact are in dispute surrounding the length of time and circumstances of the response to the emergency call. Therefore, the issue of whether the sheriff and jail personnel acted with deliberate indifference cannot not be decided on summary judgment. However, the evidentiary material shows no basis for a claim against the Board of County Commissioners as a matter of law, and we hold that summary judgment was properly granted in favor of the Board.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶ 6 Eva Crowell was booked into the Cleveland County jail on August 4, 1999. During booking, Ms. Crowell reported that she had asthma and took Albuterol. The sheriff's office initial plan and progress notes indicate that Albuterol was the only medication that had been brought in for Ms. Crowell at the time of her transfer from the Oklahoma City jail. According to the jail medication administration record for August 1999, Ms. Crowell's medical instructions included two puffs on the Albuterol Inhaler

four times a day. The record shows that the inhaler was provided four times a day from August 5 through August 19. According to the jail's progress notes, on August 9, 1999, Ms. Crowell complained about "not being able to get her inhaler during the night if she needs it," and that the amount given to her was not enough. Another notation indicates Ms. Crowell had reported that she usually has some breathing difficulty at night.

¶ 7 On August 20, 1999, a notation in the medication administration record indicates that the Albuterol instruction was changed to "AS NEEDED." A second notation instructed that the Albuterol Inhaler was to be provided four times a day if needed within a 24 hour period, along with the following admonition: "(DO NOT MAKE HER WAIT—for scheduled med time)." Pursuant to the Oklahoma Department of Health State Jail Standards,[2] Ms. Crowell was not allowed to keep her inhaler in her cell. The inhaler was stored in a locked cabinet in a medical room, as provided by the Detention Manual.[3] The medical room was located on the second floor of the jail. The pod where Ms. Crowell was incarcerated was on the first floor of the jail.

¶ 8 Ms. Crowell's inhaler had been changed from "scheduled only" medication to "as needed" medication on August 20 because she had been needing the inhaler around 2:30 to 3:00 a.m. for the preceding three or four days. According to reports of interviews conducted by the Oklahoma State Bureau of Investigation,[4] there had been discussions about keeping Ms. Crowell's inhaler in the North Control, by the inmate pod, in case she needed it and the medical rover was not on the floor.[5] The North Control had a door which could be opened into the sally port, and a deputy could open the door and give the inhaler to Ms. Crowell as needed.

2. Standard 310:670–5–8 of the Jail Standards provides:

Adequate medical care shall be provided in a facility. The administrator shall develop and implement written policies and procedures for complete emergency medical and health care services. Policies and procedures shall include at least the following:

....

(2)(A) ... Prescription medications shall be provided to the prisoner as directed by a physician or designated medical authority.... Neither prescription or over-the-counter medications shall be kept by a prisoner in a cell with the exception of prescribed nitroglycerin tablets.

....

(5) Each facility shall have a plan and provide twenty-four (24) hour emergency medical and dental care.

3. The Cleveland County Detention Manual provides:

6.01 Medical Services Policy

All Cleveland County Detention Center inmates shall be entitled to health care comparable to that available to citizens in the surrounding community.... No Deputy or other employee will ever summarily or arbitrarily deny an inmate's request for medical services.

....

6.06 Medication/Pharmaceutical Policy

3. Storage: All medication, both prescription and non-prescription, and all needles/syringes are stored in the locked cabinet in the medical treatment room.

4. Defendants moved to strike the Representative's proffered OSBI investigative reports on the grounds that they constituted inadmissible hearsay. The reports are signed by the preparing OSBI agent, and are summaries of interviews with jail personnel and inmates. On June 24, 2008, the trial court converted the motion to strike to a motion in limine, and granted it as to the admissibility of the OSBI's Investigative Report *at trial as direct evidence.* The Court of Civil Appeals, in footnote 5 of its opinion, stated, "The trial court ruled that Representative's proffered OSBI Investigate Report, which contained summaries of interviews with certain Sheriff's Employees and inmates, was inadmissible hearsay." The trial court's ruling, however, pertained to its inadmissibility at trial independently as "direct evidence," and did not address its consideration for purposes of reviewing a summary judgment motion. On summary judgment, under Oklahoma District Court Rule 13, 12 O.S. Supp.2002, ch. 2, app. 1, a procedure is set forth for challenging the admissibility of evidentiary material submitted by another party when that material "does not appear to be convertible to admissible evidence at trial." Rule 13(c). The evidentiary materials attached to a response to a motion for summary judgment are not held to the standard of competent, admissible evidence. *See Julian v. Secured Investment Advisors,* 2003 OK CIV APP 81, ¶¶ 17–18, 77 P.3d 604, 607; *Davis v. Leitner,* 1989 OK 146, ¶ 13, 782 P.2d 924, 926. The evidence compiled in the reports has probative value, controverts defendants' statement of undisputed facts in parts, and is convertible to admissible evidence at trial. The OSBI reports were sufficient evidentiary materials for consideration on summary judgment.

5. Oklahoma State Bureau of Investigation Reports, Interview of Deputy Jeanne Anne Beck, page two.

Additional information in the record indicates that from the first day of her incarceration, Ms. Crowell had begged the jail nurse to give her free access to her inhaler in case of emergency.[6] Additional information indicates that she had a history of asthma attacks whereby she needed her inhaler.[7] Other evidentiary material indicates that Ms. Crowell had a similar incident to the asthma attack of August 25, on a previous stay at the jail, and that emergency services had to be called.[8]

¶ 9 At the time of Ms. Crowell's asthma attack, Deputy Jeanne Beck was working as a north control deputy in the north control booth on the second floor of the jail.[9] Deputy Michael Easley was the shift supervisor, working as a detention corporal in booking. Deputy April Cummins was the med rover on duty at the time of the asthma attack. Deputy Kenneth Albrecht was working as a detention deputy, and Deputy Michael Stevenson was working as a detention corporal in the master control on the first floor.

¶ 10 The record shows significant discrepancies in the details of the circumstances on the morning of Ms. Crowell's fatal asthma attack on August 25, 1999. Deputy Beck stated that she received a call for Ms. Crowell's inhaler at 2:38 a.m., and that she noted the time on her log. Deputy Beck said she called the medical rover, Deputy Cummins, who was on the first floor conducting a head count. According to Deputy Beck, Deputy Cummins told Deputy Beck she would be there "in a minute." Deputy Beck related she knew Deputy Cummins was aware of Ms. Crowell's asthma problem. Deputy Beck stated that at 2:40 a.m., she heard Ms. Crowell's cell mate, Judith Hall, say that Ms. Crowell was turning blue. At 2:41 a.m., Deputy Beck said that she radioed her colleagues, "guys, get up here now." Deputy Beck stated that a few seconds after the call, Corporal Michael Easley and Deputy April Cummins arrived at the gate to the day room where Ms. Crowell was lying on the floor. Deputy Beck said she had no medical training, and knew nothing about asthma. Deputy Beck let Inmate Mia Adams out of her cell to assist since Adams was a nurse. Deputy Beck further stated that the emergency crew arrived at 2:44 a.m.

¶ 11 Corporal Stevenson stated that the first call for the inhaler was at 2:38, and that on the video monitors, he saw Corporal Easley arrive and begin CPR before the emergency crew arrived at 2:44 a.m. Deputy Albrecht stated that he was assigned to do head count in section C. Deputy Albrecht knew Ms. Crowell had asthma and that her inhaler was on an "as needed" basis. He heard the first report of an emergency on his radio at 2:41 a.m., and the second call about 15 seconds later, when he started toward section A on a run. He stated he arrived in the day room at the same time as Corporal Easley. He observed an inmate performing CPR on Ms. Crowell when he arrived, and at the same time, Deputy Cummins arrived with an inhaler. Deputy Albrecht noticed that Ms. Crowell appeared "purplish and gray" and that her eyes were rolled back. He stated that he and Corporal Easley checked Ms. Crowell's pulse, and she was not breathing. He then went downstairs and escorted the emergency crew to Ms. Crowell at 2:44 a.m.

¶ 12 Deputy Cummins stated that at 2:38 a.m., she was in the area where inmates are booked, and clearing head count. She was the med rover and responsible for passing out medication to inmates as needed, and also to rove around the jail doing whatever

---

6. OSBI Reports, Interview of Cheryl McMurray, page two.

7. OSBI Reports, Interview of Teresa Walker, page two. According to the report, Walker believed it always took too long to get the inhalers to Ms. Crowell.

8. *Id.* at n. 6.

9. Ms. Crowell was in cell 204 in section A, on the second floor. The detention center has three floors. The inmates are housed on the second floor, which is divided into a south side with sections A & B, and a north side with two sections C & D. The booking area is on the first floor. Inmate medications are kept in a locked medicine cabinet located in a medical room on the second floor, next to the nurse's office. From the north control booth, access to all the inmate area doors and gates on the second floor are opened, closed, locked, and unlocked.

needed to be done at the time. At that time, Deputy Beck received a call from Judy Hall, the cell mate of Ms. Crowell, stating that Ms. Crowell needed her inhaler. She said Ms. Crowell utilized the inhaler "quite a lot." She told Deputy Beck it would be a minute or so before she got the inhaler, as she was clearing head count, and it was not portrayed as a life or death situation. A minute and a half later, she was en route to the med room when a second call came saying Ms. Crowell needed the inhaler right away. Deputy Cummins told Deputy Beck she was on her way to the second floor. When she got to the second floor, a third call came from Deputy Beck saying, "everyone get up here now—she's turning blue." She thought the log showing the third request made at 2:41 a.m. may not be accurate. She got the inhaler and she and Corporal Easley entered the pod together, and inmate Hall was pumping Ms. Crowell's chest.

¶ 13 According to the OSBI report, Corporal Easley stated at that 2:38, he was booking in a prisoner when the call came for the inhaler. He heard Deputy Cummins say she would get the inhaler, and when the second call came, Deputy Cummins dropped what she was doing and went to get the inhaler. When the third call came, he went to the sally port. In his deposition, Corporal Easley stated that at the time of the first call, "my med rover, Deputy Cummins, was booking someone in. We had two booking windows." He said Deputy Cummins "continued to finish booking her—the person she was working on because it's very hard to switch that out and have another deputy step in and do it because there's a whole set of procedures you have to do to get someone booked in." This account varies from Deputy Beck's statement that Deputy Cummins was conducting a head count, and Deputy Cummins' statement that she was clearing head count. He stated that "a few minutes later," a second request was made for the inhaler, at which time Deputy Cummins went upstairs to the med room. He also stated that Ms. Crowell requested the inhaler a lot, and in the middle of the night.

¶ 14 According to the OSBI reports of the inmate interviews, Ms. Crowell's cell mate, Judith Hall, stated that between 2:00 and 2:30, Ms. Crowell called her and said she needed her inhaler. Hall pushed the intercom button several times before anyone responded. Ms. Crowell was in distress so Hall pulled her off the top bunk by her shirt and blanket. Hall pushed the intercom again and said "she's really needing this inhaler now—let's go." Hall asked for the door to be opened to get her in the day room, and a minute or so later, they told her to have Ms. Crowell meet them at the sally port. Hall wrapped a blanket around Ms. Crowell and pulled her towards a table in the day room. Ms. Crowell said she was dying and her lips were blue, and she collapsed on the floor.

¶ 15 In estimating the time interval between Ms. Crowell sitting up in bed in distress and reaching the table in the day room, Hall said probably 10 to 12 minutes had gone by. Hall relayed by intercom the information that Ms. Crowell's eyes had rolled back in her head and she had stopped breathing. She did not know if there was a response, because she immediately went back to Ms. Crowell to try to get air into her. Another inmate did chest compressions. Three or four minutes after the inmates started the CPR, the sally port door opened and Deputies Albrecht, Cummins, and McDaniels arrived. They told the inmates to get back in their cells and released the inmate nurse, who checked Ms. Crowell's pulse and gave a negative look indicating it was too late. Hall stated that Ms. Crowell never regained consciousness, and that none of the deputies ever attempted CPR.

¶ 16 Teresa Walker stated that she heard hollering at 2:38, looked out her cell window, and saw Ms. Crowell on her back on the day room floor. Her cell mate was with Ms. Crowell, and started to do chest compressions. She pushed the intercom button, but no one answered, and another inmate waved and flailed her arms in front of security cameras to no avail. Walker stated that approximately 12 to 20 minutes went by before any deputies arrived. Another inmate, Michele Adams, stated that two inmates performed CPR on Ms. Crowell for at least 5 to 7 minutes. She stated that Deputy Cummins arrived and got Rebecca Dean, an LPN, out

of her cell and Dean took charge of the CPR. Inmate Boyd stated that at 2:30 she heard screaming and saw Ms. Crowell on her back, and Hall pumping on Ms. Crowell's chest. She stated that "[i]t seemed like 15 minutes before any jailer came to the scene," and that when Deputy Cummins arrived, so did the emergency crew. Another inmate, Cheryl McMurray, estimated that it took at least 15 to 20 minutes before a response from the jailers. According to other OSBI interviews, two members of the fire department stated that they responded to the call regarding a female inmate in medical distress at approximately 2:30 a.m.

¶ 17 On March 22, 2005, Anna M. Boen, Personal Representative of the Estate of Eva June Crowell, decedent, filed an action against Dewayne Beggs, as Sheriff of Cleveland County, five employees of the sheriff's office,[10] and the Board of County Commissioners of Cleveland County, arising from a delay in responding to Ms. Crowell's acute asthma attack on August 25, 1999, while Ms. Crowell was incarcerated in the Cleveland County jail. Ms. Crowell went into respiratory arrest before the inhaler arrived, was transported to a hospital, and died thirteen days after her attack. The personal representative asserted that Ms. Crowell's death was caused by the unreasonable delay of the sheriffs' employees in responding to the emergency call for Ms. Crowell's inhaler. In her petition, the personal representative asserted various theories of liability, including gross negligence and reckless disregard of Ms. Crowell's welfare for failure to provide proper medical care and medication. The personal representative also asserted violations of Ms. Crowell's constitutional rights under the Eighth Amendment for cruel and unusual punishment, and civil rights under 42 U.S.C. § 1983, for refusal to provide the medical care that would have saved decedent's life, while employees knew

of her serious medical condition and deteriorating status. The personal representative also alleged violations based on failure to properly train and supervise personnel; failure to provide proper medical care and medication; and failure to adopt appropriate procedures for dealing with emergencies.

¶ 18 The defendants Board of County Commissioners, Sheriff Beggs, and sheriff's employees Albrecht, Beck, and Stevenson, filed a motion for summary judgment on February 9, 2007.[11] On May 17, 2007, the court denied summary judgment with respect to the Board of County Commissioners, and with respect to the individual defendants Beggs, Albrecht, Beck, and Stevenson in their official capacities. The court granted the motion for summary judgment with respect to the individual defendants Beggs, Albrecht, Beck, and Stevenson in their individual capacities.[12]

¶ 19 On March 7, 2008, the defendant Commissioners, Sheriff Beggs, and sheriff's employees Albrecht, Beck and Stevenson filed a second motion for summary judgment. Defendants asserted that the second motion was proper because after presentation of the first motion, the personal representative's expert stated in deposition that a four minute response time was "not bad." Defendants further asserted that the Board of County Commissioners was not a proper party to the § 1983 lawsuit; that none of the employees were deliberately indifferent to Ms. Crowell's alleged serious medical needs, and that no action of the employees, lack of training, or custom or policy of the sheriff's office, caused Ms. Crowell's death.

¶ 20 The trial court denied the second motion for summary judgment on June 6, 2008, but allowed for the decision to be reconsidered at pretrial. At pretrial, the court found that the evidentiary materials submitted by the personal representative supported only a

10. The employees and officers were Corporal Michael Easley, Corporal Michael Stevenson, Deputy Jeanne Beck, Deputy April Cummins, and Deputy Kenneth Albrecht.

11. The docket sheet indicates that Sheriff Beggs, in his official capacity, and the Commissioners had previously filed a motion to dismiss on August 5, 2005. The docket sheet shows that the

Commissioner's motion to dismiss federal § 1983 claims was denied on September 13, 2005. The docket sheet does not indicate a ruling on the Sheriff's motion.

12. The docket sheet shows that on May 17, 2007, judgments were entered for all of the defendants on the issue of negligence, including Cummins and Easley.

finding of negligence and not of deliberate indifference. The court granted summary judgment on defendants' motion.[13]

## MATERIAL QUESTIONS OF FACT ARE IN DISPUTE REGARDING DELIBERATE INDIFFERENCE, PRECLUDING SUMMARY JUDGMENT FOR THE DEFENDANT SHERIFF AND JAIL PERSONNEL

 ¶21 Summary judgment is appropriate only when there is no substantial controversy as to any material fact. 12 O.S. 2001, ch. 2, app. 1, Rule 13; *Copeland v. Tela Corp.*, 1999 OK 81, ¶4, 996 P.2d 931, 932. The moving party has the initial burden of showing that there is no substantial controversy as to any material fact. *Bowers v. Wimberly*, 1997 OK 24, ¶14, 933 P.2d 312, 315. If the moving party meets its burden, then the adverse party has the burden of demonstrating the existence of a dispute of material facts. *Hughey v. Grand River Dam Auth.*, 1995 OK 56, ¶8, 897 P.2d 1138, 1143. Circumstantial evidence may be presented to successfully oppose a motion for summary judgment. *Copeland*, 1999 OK 81 at ¶4, 996 P.2d at 933.

 ¶22 Both the trial court and reviewing appellate court bear an affirmative duty to test all evidentiary material tendered in the summary process for its legal sufficiency to support the relief sought by the moving party. *Manley v. Brown*, 1999 OK 79, ¶22, 989 P.2d 448, 455. The focus of the trial court and appellate court is whether the tendered proof in the record reveals only undisputed material facts supporting but a single inference that favors the moving party. *Id.* at ¶22, n. 28, 989 P.2d at 455. However, all facts and inferences must be viewed in a light most favorable to the non-moving party. *Id.* at ¶22, 989 P.2d at 455. If a reasonable person might reach a differ-

ent conclusion from the facts than that suggested by the motion for summary judgment, granting summary judgment would be improper. *Copeland*, 1999 OK 81 at ¶4, 996 P.2d at 933. Upon review, we conclude the evidentiary material in the case at hand (1) demonstrates material facts are in dispute that preclude summary judgment in favor of the sheriff's employees on the issue of the deliberate indifference, and (2) circumstantial evidence supports a reasonable inference that the Sheriff, as the supervising authority, likewise acted with deliberate indifference.

 ¶23 We reach a different conclusion, however, concerning the personal representative's claims against the Board of County Commissioners of Cleveland County. Under Oklahoma law, the sheriff is the final policymaker for a county jail.[14] The sheriff, and not the board, is responsible for medical care in Oklahoma.[15] Also, the board of county commissioners is not liable under 42 U.S.C. § 1983 because the board has no statutory duty to hire, train, supervise, or discipline county sheriffs or deputies.[16] Therefore, the summary judgment in favor of the Board of County Commissioners of Cleveland County was proper as a matter of law.

¶24 Personal representative bases her claim against the Cleveland County Sheriff and jail personnel upon a violation of the Eighth Amendment. This Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Ingraham v. Wright*, 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Estelle v. Gamble*, 429 U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

**13.** For purposes of 12 O.S.2001 § 994, this order disposed of all the claims and all the parties because the docket sheet shows that Easley and Cummins were never served with summons, that an attorney never entered an appearance on their behalf, and that they never answered the petition.

**14.** *Madoux v. City of Norman,* 2008 WL 938596 (W.D.Okla.2008).

**15.** *Id.* at n. 14; *see* 57 O.S.2001 § 52; 19 O.S. 2001 § 513; 57 O.S.2001 § 47.

**16.** *Id.* at n. 14.; *see Meade v. Grubbs,* 841 F.2d 1512 (10th Cir.1988).

¶ 25 The United States Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle*, 429 U.S. at 104, 97 S.Ct. 285; *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment therefore applies to prison officials when they provide medical care to inmates. *See Estelle*, 429 U.S. at 103, 97 S.Ct. 285.

¶ 26 Where a prisoner's Eighth Amendment claims have arisen in the context of the provision of medical care, the prisoner must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. 285. An Eighth Amendment medical claim has two elements, "[1] the seriousness of the prisoner's medical need and [2] the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1992), overruled on other grounds, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997); *see Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). The prisoner must show (1) *objectively* that he suffered a sufficiently serious deprivation and (2) *subjectively* that prison officials acted with deliberate indifference in allowing or causing the deprivation to occur. *Wilson v. Seiter*, 501 U.S. 294, 298–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

¶ 27 With respect to the first element, where a prisoner establishes the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970. A medical need is considered serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104, 97 S.Ct. 285). The standard for an Eighth Amendment violation contemplates "a condition of urgency" that may result in "degeneration" or "extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994), cert. den., 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995)); *see also Harrison v. Barkley*, 219 F.3d 132, 136–37 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'") (quoting *Chance*, 143 F.3d at 702).

¶ 28 Relevant factors for determining whether a serious medical need exists include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702 (quoting *McGuckin v. Smith*, 974 F.2d at 1059–60 (9th Cir.1992), overruled on other grounds, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997)).

¶ 29 In the case at hand, "the responsibility for medical care of persons incarcerated in the Cleveland County Detention Center ... [is placed] squarely on the sheriff."[17] "The sheriff, makes the policies and provides the supervision."[18] The sheriff of each county in Oklahoma has a statutory duty to provide "medical care when required, and all necessities for the comfort and welfare of prisoners." 57 O.S.2001 § 52. This duty underlies the sheriff's liability as the supervisory authority.

¶ 30 "A supervisor is not liable under section 1983 unless an 'affirmative link' exists between the [constitutional] deprivation and either the supervisor's 'personal participation, his exercise of control or direction, or his failure to supervise.'" *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir.1988) (quoting *Specht v. Jensen*, 832 F.2d 1516, 1524 (10th Cir.1987) (reh'g en banc granted on other grounds, and judgment, but not opinion, vacated.)) However, a plaintiff may meet this burden by showing, that the "supervisory defendant breached a duty imposed by state

---

**17.** *Id.* at n. 14

**18.** *Id.* at n. 14.

or local law which caused the constitutional violation." *Id.* (citations omitted).

¶ 31 In Oklahoma, as previously stated, a sheriff has a statutory duty to provide medical care to prisoners and is responsible for the proper management of the jail and the proper conduct of the jail personnel. "As a result, 'a sheriff is accountable in a § 1983 action whenever a sheriff, in a position of responsibility, knew or should have known of the misconduct, and yet failed to prevent future harm.'" *Id.* (quoting *Anthony v. Baker*, 767 F.2d 657, 666 (10th Cir.1985)). Where liability is based on what the defendants knew or should have known, "self-imposed ignorance" on the part of the defendants is not determinative, and a plaintiff may show the matters that the defendants knew or should have known by circumstantial evidence and inference. *Copeland*, 1999 OK 81 at ¶¶ 8 and 10, 996 P.2d at 933–34.

¶ 32 Depending on its degree, asthma can be a serious medical condition. *Garvin v. Armstrong*, 236 F.3d 896 (7th Cir.2001). With respect to the first element of § 1983 claim against the Sheriff and jail personnel, a reasonable fact finder could conclude from the evidence that Ms. Crowell's asthma constituted an objective, serious medical condition. Viewing the evidence in the light most favorable to the personal representative, the degree of Ms. Crowell's asthma was severe. Ms. Crowell frequently had urgent need for the inhaler, to the point that a discussion had taken place regarding placement of the inhaler close to her cell. Her dosage had been increased to as needed, and she had been calling for the inhaler during the night. The jail personnel recognized the severity of her condition as evidenced by the notation to not make her wait for the inhaler. The personal representative's evidentiary material was sufficient to create a question of fact regarding a serious medical condition.

¶ 33 Once a party has established the existence of a prisoner's serious medical need, the party must then show that prison officials responded to the serious medical need with deliberate indifference. *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970. Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Id.* at 835, 114 S.Ct. 1970. Before it can be established that a prisoner's civil rights have been abridged regarding medical care, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.1980) (citing *Estelle*, 429 U.S. at 105–06, 97 S.Ct. 285); *see also Toguchi v. Soon Hwang Chung*, 391 F.3d 1051, 1057 (9th Cir.2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); *McGuckin*, 974 F.2d at 1059. Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Whitley*, 475 U.S. at 319, 106 S.Ct. 1078).

¶ 34 In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment. Deliberate indifference may also be shown by the way in which prison officials provide medical care. *Hutchinson v. United States*, 838 F.2d 390, 393–94 (9th Cir.1988). An official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

¶ 35 Delays in providing medical care may manifest deliberate indifference. *Estelle*, 429 U.S. at 104–05, 97 S.Ct. 285. To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful. *See Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir.1994); *McGuckin*, 974 F.2d at 1059; *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir.1990); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir.1989); *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir.1985). In this regard, "[a]

prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.2006); *see also McGuckin*, 974 F.2d at 1060.

¶ 36 In the present case, the duration of the delay, and the circumstances surrounding the delay, are sharply disputed. The personal representative submitted evidentiary material indicating that jail personnel were aware that urgency was essential when Ms. Crowell needed her inhaler, that jail personnel did not respond promptly when the call was made for the inhaler, and that the delay in bringing the inhaler to Ms. Crowell was as long as twenty minutes. The personal representative's evidentiary material also indicated that jail personnel recognized that placement of the inhaler in locked storage delayed the response time for bringing the inhaler to Ms. Crowell, and a proposal to keep the inhaler in closer proximity had been discussed but not implemented. The medical evidence showed that Ms. Crowell died from an acute asthma attack.

¶ 37 Under these circumstances, a reasonable fact finder could conclude that the jail personnel and Sheriff acted with deliberate indifference to Ms. Crowell's serious medical needs. We conclude that there were genuine issues of material fact with respect to deliberate indifference arising from the delay in providing medical care to Ms. Crowell. Accordingly, the summary judgment in favor of defendants Beggs, as sheriff, and Albrecht, Beck, and Stevenson, in their official capacities, is reversed and the cause is remanded for trial.

**CERTIORARI PREVIOUSLY GRANTED; OPINION OF THE COURT OF CIVIL APPEALS VACATED; JUDGMENT OF THE TRIAL COURT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

¶ 38 EDMONDSON, C.J., HARGRAVE, OPALA, KAUGER, WATT, COLBERT, and REIF, JJ., concur.

¶ 39 TAYLOR, V.C.J., with whom WINCHESTER, J., joins, dissenting.

**The Court of Civil Appeals was correct. I would affirm the trial court on the issue of "deliberate indifference" and all other issues.**